Stephen W. Rupp, Trustee (2824)
Jeremy C. Sink (9916)
**McKAY, BURTON & THURMAN**
170 South Main Street, Suite 800
Salt Lake City, Utah 84101
Telephone: (801) 521-4135
Facsimile: (801) 521-4252

Attorneys for Stephen W. Rupp, Trustee of the Deborah Sue Fabbro bankruptcy estate.

---

### IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| In re | : | |
| | | Bankruptcy No. 06-23005 WTT |
| DEBORAH SUE FABBRO, aka | : | [Chapter 7] |
| DEBORAH S. FABBRO-VOIGHT, | | |
| | : | |
| Debtor. | | |
| | | |
| STEPHEN W. RUPP, TRUSTEE OF THE | : | Adv. Proc. No. 07-2002 |
| BANKRUPTCY ESTATE OF DEBORAH | | |
| SUE FABBRO, | : | |
| | | |
| Plaintiff, | : | |
| | | |
| vs. | : | |
| | | |
| TYLER B. AYRES et al., | : | |
| | | |
| Defendants | : | |

---

### PLAINTIFF'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above entitled matter came on regularly for trial on May 5, 6, 13 and 14, 2009 before

the Honorable William T. Thurman, United States District Bankruptcy Court Judge with the

1

Plaintiff, Stephen W. Rupp, Trustee of the Bankruptcy Estate of Deborah Sue Fabbro appearing

and being represented by Jeremy C. Sink and Nickolas S. Rice of McKay, Burton & Thurman

and Defendants appearing and represented by Blake Miller of Miller Guymon, with the exception

of defendants Bill and Brenda Nelson who appeared pro se.  The Court, after considering all of

the testimony adduced at trial, all the exhibits and otherwise for good cause appearing does now

make and adopt the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

**<u>PARTIES</u>**

1. Debtor, Deborah Sue Fabbro ("Debtor" or "Fabbro"), filed a Chapter 7 bankruptcy

   petition on August 15, 2006 and paid $900 to her bankruptcy counsel for filing that

   bankruptcy.  Trial Testimony of Deborah Sue Fabbro (hereinafter "Fabbro Testimony"),

   May 5, 11:04 a.m.

2. Plaintiff Stephen W. Rupp, is the duly appointed and acting trustee of the bankruptcy

   estate of Deborah Sue Fabbro.

3. The defendant Tyler B. Ayres, dba Ayres Law Firm is an individual residing in the

   County of Salt Lake, State of Utah.  Final Pretrial Order, Adversary Proceeding No. 07-

   2002, docket # 91 (hereinafter "Final Pretrial Order"), ¶ 4b.

4. The defendant Tyler B. Ayres PC is a registered professional corporation licensed to

   conduct business and doing business in the State of Utah.  Final Pretrial Order ¶4b.

5. The defendant Investors Title Insurance Agency, Inc. ("Investors Title") is a registered

   corporation licensed to conduct business and doing business in the State of Utah.  *Id.*

6. The defendant Austin Heywood Jr. ("Heywood") is an individual residing in the State of

Utah, County of Salt Lake and an agent of RE/MAX Results, LLC.  *Id.*

7.  The defendant Inferno, LLC is a registered limited liability company conducting business in the State of Utah.  *Id.*  Inferno, LLC manages family money for Austin Heywood, Tyler Ayres and some other family members, including Austin's dad and Tyler's dad.  Troa; Testimony of Austin Heywood, Jr. (herinafter "Heywood Testimony"), May 6, 12:06:30. Inferno, LLC operates under the instructions of Austin Heywood, Tyler Ayres and Becky Sturzenegger. Heywood Testimony, May 6, 12:07:30; see also Nelson Testimony, May 6, 4:43:10.

8.  The defendant William F. Nelson ("Nelson") is an individual residing in the State of Utah.   Final Pretrial Order, ¶ 4b.

9.  Defendant Brenda Nelson is an individual residing in the State of Utah and is the wife of William F. Nelson.  *Id.*

10.  Defendant Chris Patterson is an individual who at the time of the commencement of this case resided in the State of Utah, County of Salt Lake.  *Id.*

11.  The defendant Relief Home Buyers, LLC dba RHB Properties is a registered limited liability company conducting business in the State of Utah.  *Id.*

12.  The defendant Seth Richmond ("Richmond") is an individual residing in the State of Utah, County of Salt Lake.  *Id.*

13.  The defendant RE/MAX Results, LLC ("RE/MAX") is a registered limited liability company conducting business in the State of Utah.  *Id.*

14.  The defendant Troy Ayres is an individual residing in the State of Utah, County of Salt Lake.  *Id.*

3

15.    The defendant Becky Heywood also known as Becky Sturzenegger is an individual residing in the State of Utah, is the spouse of Heywood and is a member of Inferno, LLC. *Id.*

16.    The defendant Steve Perry is an individual residing in the State of Utah. *Id.*

17.    The defendant Robert Allphin is an individual residing in the State of Utah. *Id.*

18.    The defendant Tyra S. Ayres is an individual residing in the State of Utah, is the spouse of Tyler B. Ayres and is a member of Inferno, LLC. *Id.*

**THE DEBTOR'S PURCHASE OF THE BRIDLE TRAIL PROPERTY**

19.    On or about April 20, 2004, the Debtor and her then husband, Daniel J. Voight, purchased a house located at 13658 South Bridle Trial Road, Draper, Utah in Salt Lake County, State of Utah (the "Property") for the purchase price of $335,000.   Final Pretrial Order ¶ 4c.

20.    In order to purchase the Property, on or about April 20, 2004, the Debtor and Voight executed a Deed of Trust dated April 20, 2004, and recorded in the Salt Lake County Recorder's Office as Entry No. 9053556, Book 8983, at Pages 4499-4517, in the amount of $335,000 in favor of New Century Mortgage Corporation.   Final Pretrial Order ¶ 4d.

21.    The Debtor's husband handled the negotiations for the purchase and financing of the house, with the Debtor simply signing documents at closing.  Fabbro Testimony, May 5, 11:06:45.

22.    On January 24, 2005, the Debtor and Voight divorced.  Pursuant to the terms of the Decree of Divorce, the Debtor was awarded the Property, subject to the mortgage.   Final Pretrial Order ¶ 4e.

23.     After the divorce, the Debtor began handling finances that had previously been handled by her ex-husband.  Fabbro Testimony, May 5, 11:06:45

24.     In July 2005, the Debtor decided to refinance the Property.   Final Pretrial Order ¶ 4g.

25.     As part of the refinance process, an appraisal was performed on the Property with a date of July 14, 2005, stating a value of the Property at $380,000.  Final Pretrial Order ¶ 4h.

26.     On August 26, 2005, the Debtor obtained a $361,000 mortgage from MortgageIt, Inc. (MortgageIt later transferred this loan to IndyMac Bank).  This was an adjustable rate loan, which contained a prepayment penalty.  A Deed of Trust was recorded to secure this new loan.  Final Pretrial Order ¶ 4i.

27.     On September 13, 2005, the Debtor obtained a $19,000 home equity line of credit in favor of Citibank Federal Savings Bank ("Citimortgage").  This home equity line of credit was also secured by a deed of trust on the Property.    Final Pretrial Order ¶ 4j.

28.     While receiving alimony and/or support payments from her ex-husband the Debtor was able to make payments on the Property; when those support payments from her ex-husband ceased, the Debtor was unable to make the payments on the Property.  Fabbro Testimony, May 5, 11:08:26.

29.     By December 2005 or January 2006, the Debtor entirely stopped making her monthly mortgage payments on the Property.   Final Pretrial Order ¶ 4k; *See also* Fabbro Testimony, May 5, 11:10:45.

**EFFORTS BY THE DEBTOR TO SELL THE BRIDLE TRAIL PROPERTY
PRIOR TO WORKING WITH THE DEFENDANTS**

30.     In November 2004, just prior to the Debtor's divorce, the Debtor listed the Property for

sale with Susie Martindale for $399,900.  *See* Plaintiff's Exhibit 4; *See also* Fabbro

Testimony, May 5, 11:11:00.

31.　On or about February 1, 2005, Ms. Martindale lowered the listing price from $399,000 to

$379,900.  *See* Plaintiff's Exhibit 4.

32.　The Debtor was unsuccessful in selling the property with Ms. Martindale.  Fabbro

Testimony, May 5, 11:12:15.

33.　On or about January 5, 2006, the Debtor listed the Property for sale with Angie Norris

with a listing price of $399,900.  Final Pretrial Order ¶ 4L; *See also* Plaintiff's Exhibit 4.

34.　During this listing with Angie Norris, Fabbro entertained one serious offer to purchase

the property.  To close on this offer, however, the Debtor needed concessions from her

lenders, including a waiver of the prepayment penalty by IndyMac Bank.   Final Pretrial

Order  ¶ 4m.  *See also* Fabbro Testimony, May 5, 11:14:00.

35.　On February 1, 2006, Ms. Fabbro drafted and sent a hardship letter to her first mortgagee,

IndyMac Bank, requesting that IndyMac Bank  "help with the pre-payment penalty."  *See*

Plaintiff's Exhibit 72.

36.　Despite her efforts, the Debtor was unsuccessful in obtaining the requested help from

IndyMac and the potential sale fell through.  Final Pretrial Order ¶ 4m; *See also* Fabbro

Testimony, May 5, 11:16:28.

37.　Heywood testified that a prior realtor pressured the Debtor to bring $9,000-10,000 to

closing in order to get out of the home and satisfy her prepayment penalty.  Heywood

Testimony, May 14, 3:54:00.  The only prior offer received by the Debtor was the January

2006 offer discussed in paragraph 34 above.  This statement is consistent with Fabbro's

day one testimony wherein she stated that if she had $10,000 more she would have been able to close on this offer.  Fabbro Testimony, May 5, 11:17:00.

38.    The Debtor, distraught after the failed sale and feeling deserted after her divorce, received a referral from her trusted tax advisor for a successful realtor named Austin Heywood who attended the same church as the Debtor's tax advisor.  Fabbro Testimony, May 5, 11:18:30.

39.    Mr. Heywood is a licensed realtor in the State of Utah and has been for the past 19 years. Heywood Testimony, May 6, 11:50:35.

## THE DEBTOR MEETS AUSTIN HEYWOOD AND IS INTRODUCED TO SETH RICHMOND

40.    Anxious to get out from under her home debt, the Debtor contacted Heywood over the phone about listing the Property for sale, and learned that he had a client list of potential purchasers.  Final Pretrial Order ¶ 4n; see also Fabbro Testimony, May 5, 11:19:35.

41.    During the first conversation with Fabbro, Heywood did not go into a lot of the details with her but indicated that Seth Richmond would give her more details.  Fabbro Testimony, May 5, 11:23:30;  see also Heywood Testimony, May 14, 3:55:15.

42.    Heywood arranged a meeting between the Debtor and Seth Richmond.  Final Pretrial Order ¶ 4r.  Fabbro Testimony, May 5, 11:20:50.

43.    Heywood did not disclose to Ms. Fabbro that she may be left with a deficiency if Seth Richmond and the investment group purchased the Property. Heywood Testimony, May 6, 3:12:45.

## THE DEFENDANTS, THROUGH SETH RICHMOND,  PRESENT THEIR PLAN TO THE DEBTOR

44.     On or about March 1, 2006 the Debtor entered into an Exclusive Right to Sell Listing Agreement & Agency Disclosure ("Listing Agreement") with RE/MAX and its agent Heywood for the purpose of selling the Property.  Final Pretrial Order ¶ 4o.   See also Plaintiff's Exhibit 2.  The Listing Agreement was filled out by Ms. Fabbro with Seth Richmond, at the request of Austin Heywood.  Heywood Testimony, May 6, 2:48:10; *see also* Trial Testimony of Seth Richmond ("Richmond Testimony"), May 13, 11:46:30. The Listing Agreement was completed at the first meeting between Richmond and Fabbro or close to that first meeting.  Fabbro Testimony, May 5, 11:22:15.

    a.     The Listing Agreement set forth a listing price of $344,900.   Final Pretrial Order ¶ 4p; *See also* Plaintiff's Exhibit 2.

    b.     Heywood defined this listing price of $344,900 as an aggressive price geared more toward avoiding foreclosure than getting top dollar over a typical six month listing period, even though he had seen no evidence that a foreclosure proceeding had begun.  Heywood Testimony, May 6, 4:08:30

    c.     Under the plain language of the Listing Agreement, Heywood, Re/Max Results and the brokers (Perry and Allphin) owed Ms. Fabbro duties of loyalty, full disclosure, confidentiality, and reasonable care.  Plaintiff's Ex. 2, ¶ 5.

    d.      Even though there was no contract or other agreement for anyone to purchase the Property, Heywood added the following language to page 3 of the Listing Agreement, "subject to 3rd party approval" and "one party exempt."  Heywood

8

explained that the "one-party exempt" language referred to the investment group's

real estate commission obligation, even though they had no agreement to purchase

the Property when this language was added to the Listing Agreement. Heywood

Testimony, May 6, 2:55:30; see also Exhibit 2, page 3.

45.  The Debtor described the conversation at the first meeting with Mr. Richmond as very

general.  Fabbro Testimony, May 5, 11:27:30.

46.  Seth Richmond did not recall the specifics of the first meeting but described the first few

meetings as follows:

a.  In the first few meetings with Ms. Fabbro, Seth Richmond testified that in order to

get this done the group would need payoffs from the lenders, make an offer to the

lender, collect her financial information, get an appraisal from the bank, **the

group would then purchase the property** and then they would resell it, that's

how they made their money.  Richmond Testimony, May 14, 3:17:00.

b.  Ms. Fabbro told Seth that she did not want to sign anything that would bind her to

anyone until she was sure that they could get the deal done.  Richmond

Testimony, May 14, 3:18:30.

c.  Ms. Fabbro treated Seth Richmond as the buyer.  Richmond Testimony, May 14,

3:18:45.

d.  In the first meetings, Richmond told Fabbro that any monies that the lenders do

not get that they are owed, she is liable for, but as of that date Richmond had

never seen a lender come after someone for those monies.  Richmond Testimony,

May 14, 3:18:55; *see also* Fabbro Testimony, May 5, 11:36:00 and 2:39:45.

9

e.      Richmond told Fabbro that **"once we purchased the home, we would start looking for a buyer."**  Richmond Testimony, May 14, 3:19:45.

f.      Richmond followed up with the Debtor through regular weekly calls.  Richmond Testimony, May 14, 3:21:15.

g.      Per Mr. Richmond, Ms. Fabbro's primary concern was whether Richmond and his group would purchase the Property.  Richmond Testimony, May 14, 3:23:30.

47.    Ms. Fabbro stated her primary goal was to get out from under the debt of the home. Fabbro Testimony, May 5, 11:36:30.

48.    At one of these meetings Seth Richmond explained the creation of the trust to Ms. Fabbro as follows:

"The way I explained it is, I say, have you ever heard of a trust fund on t.v., you know, rich grandma and grandpa set up something so that greedy aunts and uncles can't get at their kids stuff that they put in a trust for them."  Richmond Testimony, May 13, 11:27:00.

49.    Seth Richmond described the Trust as a legal envelope to protect assets and told the Debtor that the group wanted to place the Property in trust in order to protect their investment.  He did not explain that she was going to be the beneficiary of the trust. Richmond Testimony, May 13, 11:27:15.

50.    After these first few meetings with Mr. Richmond, Ms. Fabbro understood that Mr. Richmond was part of an investment group that included Bill Nelson.  Ms. Fabbro also understood that Mr. Richmond was somehow associated with Austin Heywood, that they were part of a team but had no understanding that Mr. Heywood was going to profit from

the Property through this team.  Fabbro Testimony, May 5, 11:26:00 - 11:35:00 and

2:54:45.

51.     Ms. Fabbro also understood that she would be getting no funds from the sale of the

Property.  Fabbro Testimony, May 5, 2006, 2:29:05.

52.     At the first face to face meeting with Fabbro, Richmond presented numerous documents

for Fabbro's signature,  Ms. Fabbro was very hesitant to sign any of the documents and

did not sign any of the documents other than an authorization to Richmond and his group

to release information to her lenders.  Richmond Testimony, May 13, 11:25:50.

53.     After the first meeting with Ms. Fabbro, Mr. Richmond understood that she would sign

the remainder of the documents whenever she was confident in the group's ability to buy

the Property.  Richmond Testimony, May 13, 11:52:30.

54.     The Debtor met with Mr. Richmond approximately four to six times in person, she was

presented numerous documents from Mr. Richmond, all of which she believed were

needed to sell her home.  She believed the group was going to help her sell her home.

Fabbro Testimony, May 5, 11:30:00.

55.     Other than Richmond, no one else explained the purpose of the paperwork presented to

the Debtor. Fabbro Testimony, 11:33:00; 11:37:30.

56.     Although Mr. Richmond was charged with explaining the documents to Ms. Fabbro

(Nelson Testimony, May 5, 4:57:00), Mr. Richmond didn't leave any of the documents

with her for her review after any of the meetings (Richmond Testimony, May 13,

11:33:35) and Richmond himself did not have a complete understanding of the

documents being presented to Ms. Fabbro for her signature.  Richmond Testimony, May

13, 11:34:00.

57.   Ulimately, Fabbro's trust in Richmond grew to where she would sign anything he

presented to her, and in fact did eventually sign each and every document Richmond

asked her to sign.  Fabbro Testimony, May 5, 11:32;00.

58.   After the Debtor met Richmond, Heywood came to the Property and took some pictures

of the Property.   This was the last face to face meeting between the Debtor and Mr.

Heywood.  Fabbro Testimony, May 5, 11:24:50.

59.   Heywood testified that at this face to face meeting he explained that a short sale was

different than a regular listing, The Debtor would get no funds, but she wouldn't need to

bring any funds to closing, she fit the short sale process, and the investment group had a

trust that they would explain to her.  Heywood Testimony, May 6, 3:55:25 and 4:09:25.

60.   Other than introducing Ms. Fabbro to the investment group, Mr. Heywood conducted no

further marketing efforts for Ms. Fabbro for the sale of the Property.  Heywood

Testimony, May 6, 2:58:10.

61.   Any and all additional marketing efforts conducted by Heywood were conducted for the

investment group's retail side of the transaction.  Heywood Testimony, May 6, 2:59:00.

**SHORT SALES AND RETAIL SALES, KEEPING THEM STRAIGHT**

62.   E. Hil Margolin, the Defendants' short sale witness defined a short sale as a negotiation

process where the lending institution engages with a person to sell the property for less

than is owed to the lender.  Trial Testimony of E. Hil Margolin ("Margolin Testimony"),

May 13, 3:55:40.

63.   Mr. Margolin defined the typical short sale process as follows:

12

a.   His relationship has changed with the debtor, he no longer is attempting to help them save their home.[1]

b.   Mr. Margolin discloses to the debtor that they are going to lose their home.

c.   He fully discloses that he or the company he works with is going to buy the property and turn around and sell it for a profit.

d.   He has a company that he works with that buys homes in short sales, which he calls the short sale investor.

e.   If the bank is willing to sell the property for a price where he or the company he works with can purchase the property and then turn around and sell it for a profit, then he or the company will purchase the property.  This is the "short sale".

f.   He and the company then turn around and sell the property and he gets a portion of the profits from the resale.  Mr. Margolin calls this the "retail sale".

g.   He frequently closes the short sale and retail sale on the same day, but the short sale always occurs first.

h.   The debtor from the short sale because they do not have a foreclosure on their credit history.

i.   However, the short sale will still show as a default on the debtor's credit history.

Margolin Testimony, May 13, 4:01:40.

64.   Margolin explained that the retail sale cannot occur prior to the short sale, as the retail sale is purchased from the short sale investor, not the Debtor.  Margolin Testimony. May

---

[1]Mr. Margolin originally tries to assist distressed debtors avoid a short sale and keep their home.

13, 4:50:35.

65.     In conducting the short sale, Margolin always uses a trust for the following reasons:

    a.     To have someone around to sign documents at closing, for Margolin's own credibility with the banks;

    b.     To have someone independent of the Debtor so the Debtor can't hold you up for money;

    c.     To maintain control over the process;

    d.     To maintain control over the property and to preserve the property, so the Debtor does not tear out fixtures, appliances, copper wiring or otherwise devalue the property.

Margolin Testimony, May 13, 4:16:15.

### THE TYPICAL SHORT SALE PROCESS FOR HEYWOOD, RICHMOND, BILL NELSON AND AUSTIN HEYWOOD

66.     When using their short sale model, in order for the investment group to sell a property for retail, they must first purchase the property through a short sale.  Nelson Testimony, May 6, 4:37:10.

    a.     Nelson testified that you can not have a short sell without the seller and bank willing to sell the property for less than what is owed.  Nelson Testimony, May 6, 4:39:00.

    b.     Similarly, Heywood testified that in order for a short sale to occur, the owner of the property must be willing to sell the property for less than the amount owed to the lenders and the lenders must be willing to accept less than the amount owed. Heywood Testimony, May 6, 12:12:30.

14

67. Heywood's primary role when involved with Bill Nelson, Seth Richmond and Tyler Ayres in short sales is to sell the property on the retail side of the transaction, but he also frequently represents sellers on the short sale side of the transaction as well. Heywood Testimony, May 6, 12:12:45.

    a. Being involved on the short sale side and the retail sale side requires Mr. Heywood to advise the seller on the value of the Property he or she will be listing for sale, then to represent the group in purchasing the property from the seller, and then to represent the group in the retail sale side by selling the property to a third party. Heywood Testimony, May 6, 12:19:00.

    b. Heywood often will market the property for the retail sale for the group prior to the short sale being completed. Heywood Testimony, May 6, 12:15:45. __

68. Seth Richmond's role is to find properties and deal with the homeowners. Richmond Testimony, May 13, 11:22:00. Richmond obtains signatures from sellers on the group's documents which include the Agreement and Declaration of Trust (Plaintiff's Exhibit 11), the Agreement of Money Disbursed and Release of All Claims (Plaintiff's Ex. 13), the Agreement and Statement of Understanding (Plaintiff's Ex. 14); and A Warranty Deed transferring the Property from the seller into the trust (Plaintiff's Ex. 35).

    a. Bill Nelson testified that Seth Richmond would frequently obtain signatures on documents where blanks had to later be filled in by Bill Nelson. *See* Nelson Testimony, May 13, 10:23:15.

69. Bill Nelson puts together a short sale package and negotiates a short sale price with the seller's lien holders. Nelson's short sale package typically contains a preliminary

15

settlement statement,  along with personal financial information for the seller including bank statements, pay stubs, financial statements, tax returns and a hardship letter.  Nelson Testimony, May 13, 10:36:45 and May 14, 2:16:00.  *See also* Nelson Testimony, May 6, 2:32:45.

    a.    When working on a short sale Bill Nelson's goal is to "buy it for nothing and sell it for a lot."  Nelson Testimony, May 6, 4:48:30.

70.    Tyler Ayres, when involved, facilitates the closing of the short and retail sales at his law firm and/or title company, Investors Title Insurance Agency, Inc.  See Plaintiff's Exhibits 7 and 9.

71.    Similar to Mr. Margolin, the defendants used a residential land trust. Nelson Testimony, May 13, 10:11:30.

    a.    However, the defendants explained that they use the trust in order to have an interest in the property and to walk away from the transaction if the bank was unwilling to do a short sale.  Nelson Testimony, May 13, 10:11:30.

    b.    Nelson's stated purpose for the trust is inconsistent with how it was explained to Ms. Fabbro in paragraph 48 above.

    c.    When involved in the short sale and retail sale side of the transactions, a trust is often used by the Defendants so that the group can have control over the property. Heywood Testimony, May 6,  12:16:45.

    d.    Heywood testified that even when the Property is in the trust, he still represents the seller (Ms. Fabbro) and the trust at the same time. Heywood Testimony, May 6, 12:25:45.  This is inconsistent with Mr. Heywood's actions as outlined below.

16

**THE DEFENDANTS MOVE FORWARD WITH THEIR SHORT SALE PLAN**

72. Notwithstanding the lack of any signature on the group's short sale documents, presented to Fabbro by Mr. Richmond (see paragraph 52 above), the defendants moved forward with the short sale negotiations.

73. On March 6, 2006, Heywood and Re/Max Results list the Property "Under Contract" on the Multiple Listing Service ("MLS").  Plaintiff's Exhibit 4; Heywood Testimony, May 6, 4:08:00.

74. On March 6, 2006, there was no contract for the purchase of the Property.   Plaintiff's Exhibit 4; Heywood Testimony, May 6, 4:08:00.

   a. As a result of listing the Property as "under contract" on MLS, interest in the Property was chilled while the Defendants tried to arrange a short sale with the Debtor and her first and second lien holders.

   b. Heywood testified that anyone who looked on the MLS would have thought that this home was under contract as of March 6, 2006 and that this "under contract"status remained until it was changed by Heywood and/or Re/Max Results on May 16, 2006.   Heywood Testimony, May 6, 4:09:45; *See also* Plaintiff's Exhibit 4.

75. Near the end of March or the first week of April, 2006, having found a new place to live, and unable to continue making the monthly payments on the Property, (See paragraphs 28 and 29 above) the Debtor moved out of the Property.  Final Pretrial Order ¶ 4t.

76. On March 16, 2006, the Group first contacts the first and second lien holders on the Bridle Trail Property requesting the loan payoffs on the Property.  *See* Plaintiff's Exhibit

17

32, p. 2.

    a.    Plaintiff's Exhibit 32 is a document maintained by Nelson and his office in the ordinary course of business, contemporaneously with the entries outlined on the document. Nelson Testimony, May 13, 11:13:45.

77.    On or about April 5, 2006, Richmond presented a Real Estate Purchase Contract to the Debtor for the potential purchase of the Property identifying the buyer as Lauren Grames with a proposed contract purchase price of $334,000.  *See* Final Pretrial Order ¶ 4u; Richmond Testimony, May 13, 11:41:30.

    a.    Lauren Grames was Richmond's spouse on April 5, 2006 and during all times relevant to this transaction.  *See* Final Pretrial Order *¶ 4v.*

    b.    The Debtor was unaware that Lauren Grames was Richmond's spouse and Richmond did not disclose this*.  See* Final Pretrial Order ¶ 4w; *See also* Trial Testimony of Deborah Sue Fabbro*; see also* Richmond Testimony, May 13, 11:40:30.

    c.    The signature and initials for the buyer on the Grames REPC, Plaintiff's Ex. 5 may be Grames' handwriting and may be her husband's, Seth Richmond. Richmond Testimony, May 13, 11:39:10.   In his deposition Mr. Richmond testified that the initials were his wife's.  Richmond Testimony, May 13,11:39:45.

    d.    Lauren Grames testified that the signature on Exhibit 5 does not appear to be her signature.  Lauren Grames Trial Testimony ("Grames Testimony"), May 13, 2:07:00.

    e.    Lauren Grames testified that Seth Richmond sometimes signed her name to

18

documents related to the group.  Grames Testimony, May 13, 2:07:15.

78.    When the April 5, 2006 Grames REPC was presented to Ms. Fabbro, Heywood

represented Ms. Fabbro as her Listing Agent under the Listing Agreement.  Heywood

Testimony, May 6, 3:03:50.

    a.    Part of Heywood's duty owed to Ms. Fabbro as her Listing Agent was to advise

her as to any traps contained in the April 5, 2006 REPC presented to her by Seth

Richmond.  Heywood Testimony, May 6, 3:04:30.

    b.    Paragraph 8 of the April 5, 2006 REPC (Plaintiff's Ex. 5), contains a pretty open

exception stating "any deemed necessary by buyer" which Mr. Heywood did not

disclose or discuss with Ms. Fabbro.  Heywood Testimony, May 6, 3:06:30; see

also Plaintiff's Ex. 5.

    c.    Bill Nelson explained that the REPC used by the investment group is "riddled

with ways for the group to dump the contract."  Nelson Deposition, May 13,

10:27:50.

    d.    Ms. Fabbro believed that the documents presented to her by Mr. Richmond were

needed to further their negotiations with the banks for the purchase of her

Property.  Fabbro Testimony, May 5, 11:43:10 and 2:27:00.

    e.    Many of the documents presented to Ms. Fabbro by Mr. Richmond, including the

April 5, 2006 REPC contained blank lines that were later filled in by Mr. Nelson.

Mr. Nelson testified that frequently Seth leaves things out.  Nelson Testimony,

May 13, 10:23:15.

79.    On April 5, 2006 the Debtor accepted the Lauren Grames' offer subject to lender

approval because the contract purchase price was less than the outstanding first and

second mortgages secured by the Property. *See* Final Pretrial Order ¶ 4x; *See also*

Plaintiff's Exhibit 5.

    a.      The Debtor does not recall the purchase price of $334,000 being on this April 5,

            2006 REPC when she signed it.  Mr. Richmond frequently presented documents

            for her to sign and she simply trusted him and signed.  *See* Fabbro Testimony; *See*

            *also* Nelson Testimony, May 13, 10:23:15.

80.    Once the Debtor executed the April 5, 2006 Real Estate Purchase Contract from Lauren

      Grames, Mr. Nelson received a copy of the executed offer from Richmond and then

      presented the April 5, 2006 Grames REPC to the two mortgage companies on the

      Property for their review and approval.  *See* Final Pretrial Order ¶ 4y; *See also* Nelson

      Testimony, May 13, 10:35:20.

    a.      Bill Nelson presented the April 5, 2006 REPC along with his typical short sale

            package to the banks in an effort to buy the property at a low price in order to turn

            around and sell it at a higher price.  Nelson Testimony, May 6, 4:48:30.

81.    As of April 24, 2006, the lenders were still considering the short sale proposal of the

      Property as presented in the April 5, 2006 Grames REPC presented to them by Mr.

      Nelson.  On April 24, 2006 the first lien holder, IndyMac Bank, hired Monte D. Roberts,

      a certified appraiser, to go to the Property to conduct an appraisal.  *See* Plaintiff's Exhibit

      67; *See also* Monte Roberts Trial Testimony ("Roberts Testimony"), May 14, 10:26:15.

    a.      When Mr. Roberts conducted his appraisal, he viewed the listing history and

            found that the current listing price for the Property was $344,900.  Roberts

Testimony, May 14, 10:45:30.

b.    As of April 24, 2006, Mr. Roberts appraised the Property to have a value of

$352,000.  Plaintiff's Ex. 67.

c.    Mr. Roberts did not render an opinion as to the value of the Property after April

24, 2006.  Roberts Testimony, May 14, 10:58:15.

**THE BANKS REJECT THE SHORT SALE PROPOSAL of $334,000 AND THE
CHUBAKS AGREE TO PURCHASE THE PROPERTY FOR $441,000**

| Short Sale Events | Retail Sale Events |
|---|---|
| 82.  On May 15, 2006, Citimortgage, the second lien holder on the Property, rejects the short sale offer of $334,00 from Lauren Grames. See Plaintiff's Exhibit 32. | |
| 83.    On May 16, 2006, Heywood, and/or Re/Max Results changes the listing on the MLS to indicate that the Property is no longer under contract.  See Plaintiff's Exhibit 4. | 83. On May 16, 2006, Heywood, and/or Re/Max Results changes the listing on the MLS to indicate that the Property is no longer under contract.  See Plaintiff's Exhibit 4. |
| 84.  On May 17, 2006, after conducting the appraisal of the Property, IndyMac Bank rejects the $334,000 Grames offer.  See Plaintiff's Exhibit 32. | |
| | 85.  On no later than May 17, 2006, possibly earlier, Albert and Jennifer Chubak visit the Property.  Chubak Testimony, May 5, 2006, 3:22:25. |
| | 86.  On May 18, 2006, the Chubaks put in an offer for the Property for $403,000.  *See* Plaintiff's Exhibit 8.[2] |

---

[2]Chubak testified that an offer of $380,000 was made by him prior to this May 18, 2006 offer.  Chubak Testimony, May 5, 2006, 3:27:00.

| | |
|---|---|
| 87.   On May 18, 2006, Grames or her then husband, Seth Richmond, executed an addendum to the April 5, 2006 Grames REPC ("Grames Addendum"), increasing the purchase price from $334,000 to $352,000. *See* Plaintiff's Exhibit 6. | |
| 88.   On May 19, 2006, Richmond presented the Grames Addendum to Ms. Fabbro increasing the purchase price from $334,000 to $352,000, and Ms. Fabbro signed the same. See Plaintiff's Exhibit 6. | |
| 89.   On May 19, 2006, the May 19, 2006 Grames Addendum was faxed to the Debtor's lien holders for their approval.  See Plaintiff's Exhibit 32. | |
| | 90.   Although testifying to the court that he received only one offer on the Property (Heywood Testimony, May 6, 2006, 4:10:20) on  May 22, 2006, Heywood sends a Multiple Offer Notification to Chubak, acknowledging the receipt of the May 18, 2006 offer from Chubak, giving **notice of multiple offers** on the Property and requesting Chubak's "best offer" for the Property.  Plaintiff's Exhibit 77. |
| | 91.   On May 23, 2006 Chubak responds to the Multiple Offer Notification and increases his offer to $441,000, through Addendum No. 1 to Chubak's May 18, 2006 offer.  See Plaintiff's Exhibit 8, p. 7; see also Chubak Testimony, May 5, 2006, 3:30:00. |

| | |
|---|---|
| | 92.  On May 24, 2006 Heywood counters the Chubak May 23, 2006 Addendum No. 1 by creating Addendum No. 2 to the Chubak Offer setting forth conditions to the Chubak Offer of $441,000.  Heywood signs his wife's name, Becky Sturzenegger to Addendum No. 2, believing that she was the Trustee of the Fabbro Residential Land Trust and represented that he had her permission to sign this document.  *See* Plaintiff's Exhibit 8, pp. 8-9; *See also* Heywood Testimony, May 6, 3:16:00 and 3:25:00. |
| | 93.  On May 24, 2006, the Chubaks accept addendum no. 2 and have a contract for the purchase of the Property for $441,000.  See Plaintiff's Ex. 8, pp. 8-9. |

94.     The following facts relate to paragraphs 82-93:

   a.     The Chubaks visited the Property in response to seeing it appear on

          [Utahrealestate.com].  *See* Trial Testimony of Albert Chubak 3:22:30.

   b.     The Chubaks had been looking at this website daily during April and May of 2006

          and saw it for the first time in mid May 2006.  Chubak Testimony, May 5, 2006,

          3:24:00; see also Plaintiff's Exhibit 4, May 16, 2006 entry.

   c.     Heywood received the May 18, 2006 Chubak offer.  Heywood Testimony, May 6,

          3:17:00

   d.     Although Heywood and/or Re/Max Results had changed the MLS to show that the

          Property was not under contract, and although the first and second lien holders

          had rejected the April 5, 2006 Grames REPC, the May 18, 2006 Chubak offer was

          not presented to Ms. Fabbro.  See Final Pretrial Order ¶ mm; See also Plaintiff's

Ex. 4; *see also* Heywood Testimony May 14, 4:01:00.

e.      The Chubak offer of $403,000 was discussed between Heywood, Sturzenegger

and Nelson but was not presented or discussed with Ms. Fabbro. Heywood

Testimony, May 6, 3:23:30

f.      Heywood testified that when the May 19, 2006 offer from Ms. Grames was

presented to Ms. Fabbro by Seth Richmond, Mr. Heywood under the Listing

Agreement was still the Listing Agent for Ms. Fabbro and he also represented the

Trust, he also testified that it was Ms. Fabbro's trust, and that he represented both

the trust and her. Heywood Testimony, May 6, 3:17:45.

g.      Ms. Fabbro was unaware that Ms. Grames was increasing her offer from $334,000

to $352,000, even though she signed the Addendum (Plaintiff's Exhibit 6).

Fabbro Testimony, May 5, 11:39:10.

h.      As of May 18, 2006, there was no Fabbro Residential Land Trust.  See Plaintiff's

Ex. 11, creating the Fabbro Residential Land Trust on June 12, 2006.

i.      Up until at least June 12, 2006, legal title to the Property was held by the Debtor.

Final Pretrial Order ¶ qq; see also Plaintiff's Ex. 35 transferring the Property from

Fabbro to the Fabbro Residential Land Trust on June 12, 2006.

j.      While the May 19, 2006 Grames Addendum for $352,000 was presented to Ms.

Fabbro for her approval and signature, the May 18, 2006 Chubak offer for

$403,000 was not presented to Ms. Fabbro.  See Final Pretrial Order ¶ mm.

Heywood Testimony, May 6, 3:22:30.

i.      Robert Allphin as the principal broker instructs his agents that once there

24

is a fully executed contract between a buyer and a seller, the agent should

no longer present any other offers to that seller.  Allphin Testimony, May

14, 3:47:00.

ii.    Before Fabbro signed the May 19, 2006 addendum to the Grames REPC,

there was no fully executed contract between Grames as the buyer and

Fabbro as the seller.

iii.    Robert Allphin testified that if the buyer defaults under any of the dates set

forth in a REPC it is the agent's duty to then help the seller.  Allphin

Testimony, May 14, 3:48:00.

k.    The listing price of the Property when Heywood received the $403,000 Chubak

offer was $344,900.  See Plaintiff's Ex. 4 and paragraph 81a. above.

l.    Heywood testified that, if an offer is made that is above the listing price on a

property, with no contingencies, then the realtor must accept that offer, he can't

increase the listing price.  Heywood Testimony, May 14, 4:29:15.

m.    However, Heywood received the May 18, 2006 Chubak offer for $403,000, which

was much higher than the listing price of $344,900 as set forth in the Listing

Agreement (Exhibit 2) and on the MLS history report (Exhibit 4) and asked for a

higher and better offer, not for the seller, but for his group (Exhibit 77).

n.    Heywood signed his wife's name, Becky Sturzenegger, to the Addendum No. 1

and No. 2 attached to the Chubak offer.  Heywood testimony, May 6, 3:26:10.

o.    In May of 2006 the real estate market in Salt Lake City had started to pick up.

Heywood Testimony, May 6, 3:24:15.  Nelson stated that the market turned from

a very poor market to a very strong market in April, May, June and July of 2006,

inventory was low demand was high.  Nelson Testimony, May 13, 10:32:00.

p.   Heywood was receiving lots of interest in the Property.  Heywood Testimony,

May 6, 3:23:45.

**THE BANKS ACCEPT THE SECOND SHORT SALE PROPOSAL**

95.   On May 31, 2006, one week after the Chubaks agreed to purchase the Property for

$441,000, IndyMac Bank accepts the Grames Addendum agreeing to short sale the

Property for $352,000.  Plaintiff's Exhibit 33. [Richmond doesn't present this letter to

Fabbro for her signature until June 27, 2006.  See also Plaintiff's Exhibit 33].  Exhibit 33

was sent directly to Nelson, not to Fabbro.  Nelson Testimony, May 13, 10:34:45.

96.   On July 5, 2006, Citimortgage agrees to a short sale of the Property for $352,000.  Final

Pretrial Order ¶ ff.  Nelson testified that this approval was after the Chubak transaction

was completed.  Nelson Testimony, May 13, 10:38:00.

**THE CLOSING OF THE RETAIL SALE AND FUNDING OF THE SHORT SALE**

97.   On June 6, 2006, Chubak created Addendum No. 3 requesting a $3,500 carpet credit, to

do repairs prior to closing and seeking permission to water the lawn.  See. Defendants'

Exhibit FF.

98.   The June 6, 2006 Addendum No. 3 was revised to be a $1,000 carpet credit.  See

Defendants' Exhibit FF.

99.   Chubak testified that he only ever received $200 for the carpet credit.  Chubak

Testimony, cross by Blake Miller, May 6, 2006 10:37:30.  No counter evidence or

testimony was presented by the Defendants related to the carpet allowance refuting

26

Chubak's testimony that he only received a $200 carpet credit.  *See* Nelson Testimony, May 14, 2:29:30.

100.  Other than the $200 cash from Mr. Heywood, there was no other evidence of a carpet credit on the Chubak Settlement Statement.  Plaintiff's Ex. 9.

    a.  Chubak was vigorously and contemptuously examined on this point by Defendants' counsel,  but no rebuttal testimony was ever presented by the Defendants.   See Trial Testimony of Heywood and Nelson.

    b.  Chubak was likewise vigorously and contemptuously examined about receiving something in return for his testimony, which he vehemently denied.  No rebuttal testimony was ever presented on this point either.  Trial Testimony of Albert Chubak cross by Blake Miller, May 5, 2006.

101.  On June 12, 2006, Richmond presented the following documents to Fabbro for her signature:

    a.  Agreement and Declaration of Trust (Plaintiff's Exhibit 11);

    b.  Agreement of Money Disbursed and Release of All Claims (Plaintiff's Ex. 13);

    c.  Agreement and Statement of Understanding (Plaintiff's Ex. 14); and

    d.  <u>A Warranty Deed transferring the Property from Ms. Fabbro, individually, into the Fabbro Residential Land Trust</u>.  (Plaintiff's Ex. 35).   The Debtor had no knowledge of what a warranty deed was when this was executed.  Fabbro Testimony, May 5, 2:45:30.  The Debtor had no understanding that her Property was being transferred into a residential land trust.  Fabbro Testimony, May 5, 11:47:45.

27

102.   On June 14, 2006, Heywood and/or Re/Max Results changed the Listing Price for the
Property on the MLS from $344,900 to $4,237.  Plaintiff's Ex. 4.

103.   On June 15, 2006 Heywood and/or Re/Max Results changed the Listing Price for the
Property on the MLS from $4,237 to $423,700.  Plaintiff's Ex. 4.

104.   On June 27, 2006, the Chubaks attended a closing of the Property at Investors Title
Insurance Agency Inc., tendered the purchase price of $441,000 plus their closing costs,
and signed the HUD-1.  The Seller for this transaction was listed as the Fabbro
Residential Land Trust.  Plaintiff's Ex. 9; *see also* Tyler Ayres Testimony, May 13,
1:40:00.

105.   As of June 27, 2006, the 100% beneficiary of the Fabbro Residential Land Trust was
Deborah Sue Fabbro.  See Plaintiff's Ex. 11; See also Plaintiff's Ex. 12 (Assigning the
beneficial interest in the Fabbro Residential Land Trust from Fabbro to Relief Home
Buyers LLC on June 28, 2006).

106.   On June 27, 2006, Investors Title Insurance Agency, Inc. cut checks for all of the closing
costs for the Chubak closing.  Plaintiff's Ex. 61.

107.   On June 27, 2006, Chris Patterson executed a Warranty Deed transferring the Property
from the Fabbro Residential Land Trust to Albert and Jennifer Chubak.  Defendants'
Exhibit GG.

108.   On June 27, 2006, when Chris Patterson executed the Warranty Deed transferring the
Property from the Fabbro Residential Land Trust to Albert and Jennifer Chubak, the
Debtor, Deborah Sue Fabbro was the 100% beneficial owner of the Fabbro Residential
Land Trust.  *See* Plaintiff's Ex. 11 (creating the trust); *See also* Plaintiff's Ex. 12

28

(assigning the beneficial interest away from Ms. Fabbro on June 28, 2006).

109.    Notwithstanding the settlement that occurred on June 27, 2006 between the Chubaks and the Fabbro Residential Land Trust, Richmond provided a Settlement Statement to Fabbro dated June 28, 2006, purporting to represent the purchase of the Bridle Trail Property by Lauren Grames from Ms. Fabbro.  Plaintiff's Exhibit 7.

110.    No evidence was presented to the Court to support that a closing or transfer of the Property from Fabbro to Grames ever took place; there was no evidence of money changing hands, no deed transferring the property to Ms. Grames, and no loan acquired by Ms. Grames or any other potential short sale purchaser to fund the purchase.

   a.    Ms. Grames testified that she believes she purchased the Property for the group (Seth Richmond, Austin Heywood, Bill Nelson).  Grames Testimony, May 13, 2:07:55.

   b.    When probed further Lauren Grames stated that she was a representative of the Trust that purchased the Property.  Grames Testimony, May 13, 2:08:10.  There is no evidence of a trust purchasing the Property from Ms. Fabbro.

   c.    Grames did not attend a closing or tender any purchase price for the alleged closing of the Property.  Grames Testimony, May 13, 2:09:30.

   d.    Bill Nelson testified that the group obtained a loan for the purchase of the Property, but that loan was only for $100,000 and was obtained over a week after the sale to the Chubaks closed and recorded.  *See* Plaintiff's Exhibit 60, July 5, 2006 entry on bates page 0200; See also Plaintiff's Exhibit 35; *See also* Nelson Testimony, May 14, 2:39:30 and 2:56:30.

29

e. The $100,000 loan mentioned by Nelson funded after the first lien holder, IndyMac Bank, had been paid its agreed upon short sale payoff. See Plaintiff's Ex. 60.

f. A Settlement Statement dated June 28, 2006 , Plaintiff's Ex. No. 7 (a "preliminary settlement statement" is also attached as Defendants' Ex. EE), was produced to the Debtor, but only after the bankruptcy had been filed. Ms. Fabbro received Ex. 7 from Mr. Heywood to respond to a document request from the Trustee. Ms. Fabbro does not recall seeing or having this document prior to her bankruptcy filing. Fabbro Testimony, May 5, 11:49:00.

g. A preliminary settlement statement was sent by Bill Nelson to the banks as part of his short sale package, along with personal financial information for Ms. Fabbro, bank statements, pay stubs, financial statements, tax returns, and a hardship letter. Nelson Testimony, May 13, 10:36:45 and May 14, 2:16:00.

h. The preliminary settlement statement, Exhibit EE, was prepared by Tyler Ayres or someone from his office. Nelson Testimony, May 13, 10:37:00.

i. In an attempt to establish that the short sale closed, Tyler Ayres testified that Exhibit EE reflected the transfer of the beneficial interest in the land trust to the investors, which closed the short sale. Tyler Ayres Testimony, May 14, 1:54:00.

i. However, Exhibit EE makes no mention of the trust and no mention of the beneficial interest. When probed on this Mr. Ayres made the following inconsistent and confusing statements. First, Exhibit EE evidenced a idences that a transaction occurred. He then restated that this document represents a

30

transaction between Lauren Grames, RHB Properties and Ms. Fabbro.  When
asked if the transfer of the beneficial interest was the short sale Mr. Ayres testified
that the transfer of the beneficial interest is not the short sale because the short
sale involves the bank.  He then testifed that exhibit EE doesn't transfer anything
(Exhibit EE). Tyler Ayres, May 14, 1:57:15.

i.      Upon further examination, Mr. Tyler Ayres stated that "the settlement
        statement can transfer nothing."  Instead, he said Exhibit EE is evidence of
        the transfer of the beneficial interest from Ms. Fabbro to Lauren Grames or
        her assigns.  He then testified that Exhibit EE evidenced the transfer of the
        beneficial interest in the Property, not the trust.  Thus, he testified that
        there was a transfer of a real property interest, not a personal property
        interest, and that he has no other documents evidencing the transfer of this
        real property interest.  Tyler Ayres Testimony, May 14, 1:58:30.  In a
        matter of a few minutes, Tyler Ayres' explanation of what the short sale
        was and when it occurred changed numerous times.

ii.     Ayres then stated that the only other evidence you would have of the
        transfer of this real property interest would be the payment of the money.
        Tyler Ayres Testimony, May 14, 1:59:00.

iii.    Margolin, the Defendants' short sale expert, testified that he did not see
        any  documents indicating that the short sale had funded.  Margolin
        Testimony, May 13, 4:32:10.

iv.     Finally, Mr. Ayres stated that you need a deed to transfer the Property

31

Tyler Ayres Testimony, May 14, 2:00:10.

    v.    The facts presented did not include a deed transferring the Property from Fabbro to Grames or any of the Defendants.

j.    Mr. Tyler Ayres was asked during the discovery phase of the litigation to produce all documents from his law firm and the title company about closings related to the Property. He testified that he fully complied with this request. Tyler Ayres Testimony, May 13, 1:35:00.

k.    Tyler Ayres testified that he has no records indicating that the transaction outlined in Plaintiff's Exhibit 7 ever closed. Tyler Ayres Testimony, May 13, 1:49:30.

l.    Finally, the Debtor testified that she did not attend a closing of the Property and was told she did not need to attend a closing. Fabbro Testimony, May 5, 2006, 11:56:00

m.    Instead of attending a closing, Seth Richmond presented Ms. Fabbro with a "Preliminary Settlement Statement" which she signed on June 28, 2006. Defendants' Ex. EE.

111.    On June 28, 2006 at 12:59 p.m., a warranty deed transferring the Property from the Fabbro Residential Land Trust to Albert and Jennifer Chubak was recorded with the Salt Lake County Recorder. Defendants' Ex. GG.

112.    On June 28, 2006, Ms. Fabbro also executed the Assignment of Beneficial Interest in Land Trust. Plaintiff's Ex. 12.

    a.    Up until June 28, 2006, when Ms. Fabbro executed the Assignment of Beneficial Interest in Land Trust, Ms. Fabbro owned the Property and all interests therein

either individually or through her beneficial interest in the Fabbro Residential

Land Trust.

b.       While Ms. Fabbro owned the Property, Austin Heywood, Re/Max Results, Seth

Richmond, Investors Title, Troy Ayres, Tyler Ayres, Ayres Law Firm, Chris

Patterson, Bill Nelson and all of the other Defendants failed to disclose to her any

of the offers or transactions of the Property, other than the alleged sale to Lauren

Grames.

c.       Ms. Fabbro was unaware of the transfer of the Property to the Chubaks, and thus

unaware of the value of the beneficial interest in the Fabbro Residential Land

Trust when she assigned her beneficial interest in the trust to RHB Properties.

Heywood Testimony, May 14, 4:01:00.

## FOLLOW THE MONEY

113.   The payoff for IndyMac Bank on its lien against the Property was $381,002.08 on March

30, 2006.  Final Pretrial Order ¶ aa.

114.   The payoff for the Citimortgage lien against the Property was $20,309.84 as of June 29,

2006.  Final Pretrial Order ¶ bb.

115.   The proceeds from the sale of the Property to the Chubaks were disbursed on June 27,

2006, by Investors Title Insurance Agency as follows:

a.       $2,205.00                 RE/MAX

b.       $3,442.73                 Investors Title Insurance Agency

c.       $420,839.84              to Ayres Law Firm, Special Escrow Account

Final Pretrial Order ¶ uu; See also Plaintiff's Exhibits 60 and 61.

33

116.   Tyler Ayres testified that the reason Indymac and Citimortgage were not paid at the

closing of the Chubak purchase as set forth in Plaintiff's Ex. 9 was because ownership

interest in the Property at this time was in the group. Tyler Ayres, May 13, 1:47:30.

117.   However, **the proceeds from the sale of the Property to the Chubaks were used to**

**pay Fabbro's first and second lien holders**: a) $329,093.22 to IndyMac and b) $6,000

to Citimortgage.  See Plaintiff's Ex. 60.

118.   The balance of the $420,839.84, the entire amount not paid to the lien holders, Re/Max or

Investors Title, was divided between the Defendants from the Ayres Law Firm Special

Escrow Account as follows:

| Defendant | Amount | Check # | Total |
|-----------|--------|---------|-------|
| Seth Richmond | $1,500 | (check 1312) | |
| | $20,656.57 | (check 1309) | |
| | $5,500 | (check 1321) | $27,656.57 |
| Austin Heywood | $225 | (check 1299) | $225 |
| Ayres Law Firm | $1,510 | (check 1300) | $1,510 |
| Bill Nelson | $6,901.60 | (check 1301) | |
| | $16.00 | (check 1302) | |
| | $5,500 | (check 1318) | |
| | $3,725.73 | (check 1530) | $16,143.33 |
| Brenda Nelson | $6,901.60 | (check 1303) | $6,901.60 |
| Chris Patterson | $2,000 | (check 1304) | $2,000 |
| Inferno | $642.31 | (check 1306) | |

34

|                | $18,451.57 | (check 1307) |            |
|----------------|-----------|--------------|------------|
|                | $5,500    | (check 1320) | $24,593.88 |
| RHB Properties | $6,901.60 | (check 1308) | <u>$6,901.60</u> |
|                |           |              | **$85,931.98** |

See Plaintiff's Ex. 60.

119.   On July 5, 2006, Citimortgage accepted a short sale for $352,000 and the group disbursed $6,000 to Citimortgage from the Ayres Law Firm Special Escrow Account.  See Plaintiff's Ex. 34 and Plaintiff's Ex. 60.

   a.   The defendants had held back enough funds to fully pay Citimortgage if they rejected the short sale.  Upon Citimortgage's receipt, the balance of the funds held back was disbursed equally between Seth Richmond, Inferno and Bill Nelson. Nelson Testimony, May 13, 10:47:45; *see also* Plaintiff's Ex. 60.  July 5, 2006 entries; *see also* Nelson Testimony, May 13, 10:46:00 and 11:20:20. .

120.   No evidence was presented to the Court to show that anyone ever tendered a purchase price of $352,000 to purchase the Property from Ms. Fabbro through a short sale.

121.   The Court finds that no short sale occurred.

**<u>REPAIRS TO THE PROPERTY</u>**

122.   Margolin testified that he does not do repairs to the properties he is involved with on short sales because there is the chance that you will not recover your money if the short sale does not occur.  Margolin Testimony, May 13, 4:16:15.

123.   Prior to April 1, 2006 Heywood went to the Bridle Trail Property, met with the Debtor and took pictures of the home.  Heywood testified that the home looked good and that he

35

did not notice any water damage on walls or wet carpets.  He said that the home showed

well.  Heywood Testimony, May 6, 2:50:10.

124.   Ms. Fabbro testified that her home was in great shape when she moved out at the end of

March or beginning of April of 2006.  Fabbro Testimony, May 5, 1:38:30.  She had

recently fixed stucco (1:39:00), replaced carpet in the upstairs bedrooms in May of 2004,

which was still like brand new when she moved out (1:40:45), she had hired a company

to fix a small leak that had occurred in the unfinished basement of the home, below the

fireplace (1:43:37), and after having this leak fixed she did not experience any leaks in

her home after that repair work was done sometime before April 18, 2005.(1:45:43).  **Ms.**

**Fabbro examined the pictures taken by Chubak, Plaintiff's Exhibits 40-58, and**

**testified that the condition of the home when she left it during the first week of April**

**2006 was similar to the condition as shown in the pictures taken by Mr. Chubak on**

**or about May 17, 2006.**  Fabbro Testimony, May 5, 2006, 1:48:10;  *See also* Plaintiff's

Exhibits 40-59.

125.   Sometime in April of 2006, after Ms. Fabbro had moved out, Mr. Nelson testified that he

went to the Property and found water on the green walls and ceiling in the fireplace room

(Plaintiff's Ex. 42) wet carpet in that room, water in the basement and wet carpet in the

upstairs bedrooms. Nelson Testimony, May 13, 10:13:00.

126.   Sometime in April 2006, Nelson testifed that he went to the Property a second time with

Glen Holman to again look at the damage to the Property. Holman described water on the

carpet in the fireplace room, water in the basement, and water on the floors in the

bedrooms above the fireplace.  He also observed water damage on the sheetrock under the

upstairs bedroom's window. Holman Testimony, May 14, 11:16:45

127. Holman testified that after this first meeting he initially was not asked to clean up the problem.  Holman Testimony, May 14, 11:20:00.  (This is consistent with the goal stated by Nelson of buying low and selling high as the appraisal for the Property had not yet occurred).

128. However, Holman was instructed to remove the carpet from the upstairs bedrooms and did in fact remove that carpet. *See* Nelson Testimony, May 14, 11:31:10.

129. Notwithstanding the testimony from Ms. Fabbro and Mr. Heywood above, concerning the condition of the Property when Ms. Fabbro moved out in late March or early April 2006, when Mr. Roberts (the appraiser for IndyMac) visited the Property on April 24, 2006, it was in a condition vastly different from the condition of the Property when Ms. Fabbro moved out a few weeks earlier; there was evidence of water damage on the wall and ceiling around and above the fireplace, the carpet in the green room with the fireplace was wet and peeled back to dry, and two of the upstairs bedrooms did not have carpet in them at all.  *See* Defendants' Exhibit FF (pictures from the Roberts Appraisal); *see also* Plaintiff's Exhibit 67; Compare with Trial Testimony of Deborah Sue Fabbro outlined in the previous paragraph.

130. The damage described by Roberts is similar to the damage described by Holman and Nelson.

131. Holman was later asked to fix the problem and repair the damage.  Holman Testimony, May 14, 11:20:10.

132. Holman testified that he returned the condition of the home to what it was in before the

water damage occurred.  Holman Testimony, May 14, 12:01:15.  This is consistent with

Fabbro's testimony that the pictures taken by Chubak were similar to the condition of the

home when she moved out.

133.   The Court believes that Mr. Holman and possibly individuals who assisted him did in fact

do some level of work on the Property between April 24, 2006 (the day the appraiser

visited) and May 16, 2006 (the day Chubak first visited the Property and took the pictures

shown as Plaintiffs Exhibits 40-58).  However, the dollar amount of those repairs is hotly

contested by the parties.  The Defendants claim $16,000-$20,000 of repairs were done.

The Plaintiff asserts that there were no improvements done but simply a clean-up of the

property, including wiping down walls with bleach, drying out the carpets and doing

cosmetic repairs to the Property that couldn't have totaled more than a few hundred

dollars in supplies and a few man hours of labor.  With regards to this dispute the Court

makes the following findings of fact:

134.   As the Group's goal was to buy low and sell high, they had no interest or reason to repair

any damage to the Bridle Trail Property prior to the appraisal being completed by

IndyMac Bank.  Nelson Testimony, May 6, 4:48:30.

135.   Similarly, Mr. Ayres testified that in his dealings with RHB, Seth Richmond and Austin

Heywood, they frequently do not put up their own money for a short sale until they locate

a third party buyer for the retail side of the transaction.  Tyler Ayres Testimony, May 13,

1:50:30.

136.   A capital investment of $16,000-$20,000 before purchasing a property through a short

sale and before finding a third party buyer for a retail sale is inconsistent with the

Defendants' testimony about how they conduct short sales.

137.   Additionally, Mr. Holman was working on five to six other projects at the same time of

the purported Fabbro Property repairs.  Holman Testimony, May 14, 11:56:10.

138.   Most importantly, the testimony of Glen Holman is inconsistent:

a.   The upstairs bedrooms

i.   On direct examination,  Holman testified that he replaced much of the

subfloor (8 feet out from the wall).  Holman Testimony, May 14, 12:05:20

However, Holman testified under oath at a prior deposition that he did not

replace the subfloor in this room. Holman Testimony, May 14, 12:07:45.

b.   Repairs to the roof:

i.   Holman testified that when he did repairs to the roof next to the cricket he

focused on the flashing, but the stucco was over the top of the flashing and

he didn't want to repair stucco.  Holman Testimony, May 14, 11:33:25.

ii.   Holman then stated that he reflashed this area but made no mention of

repairing the stucco that would have been destroyed if the old flashing had

been removed.  Holman Testimony, May 14, 11:33:50.

iii.   Holman then gave a detailed description of the roof on the Property,

specifically the area of concern containing the cricket.  He then described

the cricket and the materials used indicating that the cricket was built to

higher specifications than the rest of the roof because of the lesser slope in

the cricket area, and that whoever had constructed the home had used a

rolled asphalt type shingle (higher quality per Holman) which was in that

area, not the standard architectural shingles like the rest of the home.

Holman Testimony, May 14, 11:24:30.

iv.   When he talked about repairing this area, Holman stated that he pulled

back the rolled shingles, put down ice and water shield (no receipt),

Holman Testimony, May 14, 11:34:45, then put everything back, matched

up shingles that would have been damaged (no receipt), and rolled the

rolled shingle back into place. Holman Testimony, May 14, 11:35:00.

Only roof felt appears on Exhibit 37, none of the other items mentioned by

Holman to conduct this repair are found on the receipts in Exhibit 37.

c.   Repairs to the green front room shown in Exhibit 42.

i.   On direct examination Mr. Holman testified that small patches of subfloor

were replaced in the green fireplace room (Holman Testimony, May 14,

11:44:00 and 12:06:20), but Holman testified at his deposition that he had

replaced 80 percent of the subfloor of this room.  Holman Testimony, May

14, 12:07:00.

d.   Mold

i.   At trial, Mr. Holman made no mention of cleaning the Property for mold

and in fact said he did not. Holman Testimony, May 14, 11:57:00.  But in

his deposition he testified that he did wash the walls with bleach related to

mold.  Holman Testimony, May 14, 12:19:30.

e.   Receipts

i.   Mr. Holman testified that he one who made supply purchases for repairs

40

done on Heywood properties.  Holman Testimon, May 14, 11:59:00

ii.      Mr. Holman testified that he did not start work on the Fabbro Property

prior to April 24, 2006.  Holman Testimony, May 14, 12:01:00

iii.     Thus, all of the receipts from prior to April 24, 2006 are irrelevant

(Plaintiff's Ex. 37 A00246-266)

iv.      Any work done by Mr. Holman was completed prior to May 16, 2006

when Mr. Chubak visited the Property, thus receipts A00276-282 in

Exhibit 37 are irrelevant.

v.       Of the remaining receipts in Exhibit 37, beginning on bates page no.

A00267 through A00275, based on the trial testimony by Mr. Holman, the

maximum amount of materials and money on bates nos. A00267 through

A00275 of Exhibit 37 that could have been applied to the Property is:

| | | |
|---|---|---|
| A00267 | $24.40 (Holman, May 14, 12:09:00 "doesn't know") | |
| A00268 | $0.00 (12:10:00 - gift card used to purchase supplies) | |
| A00269 | $91.76 (12:10:35 - nothing for sure ) | |
| A00270 | $95.88 (12:12:45 - no attic fan - 2nd and 3rd items possibly) | |
| A00271 | $94.26 (12:13:35 -I can't tell) | |
| A00272 | $26.07 (12:14:00 - dricore not for Bridle Trail, remainder possibly) | |
| A00273 | $21.35 (12:14:30 - no yard work) | |
| A00274 | $120.55 (12:15:30 - all possibly used) | |
| A00275 | $0.00   (12:16:40 - no electrical or plumbing repairs) | |
| | $474.27 | |

vi.      However, on these receipts there are no shingles, no paint, no plaster or

mud to repair replaced dry wall, and no flashing.  Essentially the only

items identified by Mr. Holman as being used in the repairs is some

drywall on A00269 and some possibly some roof felt on A00272.

41

f.    Wages

i.    Plaintiff's Ex. 36 includes wages for March of 2006 through June of 2006 even though Mr. Holman testified that he did not begin work on the Property until after April 24, 2006 and the work would have been completed prior to May 16, 2006.  Additionally the wages are for multiple jobs being worked on by the employees.  Holman Deposition, May 14, 12:22:00.

ii.   Mr. Holman testified that he was paid $600 per week.  Even if he and two other workers had worked non-stop on this project for the three weeks in between April 24, 2006 to May 16, 2006, at $600 per week, only $4,800 (3 weeks wages for each independent contractor at $600 per week, or $1800 per independent contractor for the three weeks) of wages would have accrued.  Holman was clear that he was working on five or six other projects at this time (Heywood also mentioned the other projects. Heywood Testimony, May 6, 3:34:00), thus if the wages are divided evenly between the six projects over that three week time frame, the maximum labor for all three workers that would have been incurred on the Fabbro Property would have been $800 ($4800/6).  Given this wage calculation and the receipt analysis above, the documents and testimony simply do not support that $16,000 - $20,000 of work was done on the Fabbro Property from April 24, 2006 to May 16, 2006.

139.    Austin Heywood, the individual who purportedly paid for all of the repairs has no first

42

hand knowledge of any repairs being done to the Property.  Heywood Testimony, May 6,

3:28:18.  Similarly, Nelson has no first hand knowledge of any repairs being done to the

Property. Nelson Testimony, May 13, 10:16:00.

140. The receipts in Exhibit 37 relate to supplies purchased for various different homes being

worked on by the Austin Heywood PC independent contractors.  Heywood Testimony,

May 6, 3:35:00.

141. The checks in Exhibit 38 relate to multiple projects and Mr. Heywood has no idea how

much relates to the Fabbro Property.  Heywood Testimony, May 6, 3:36:00.

142. Heywood did not maintain a separate accounting for each project being worked on by

independent contractors for Austin Heywood PC.  Heywood Deposition, May 6, 2006,

3:33:05

143. With regards to Exhibits 36, 37 and 38, Nelson has no idea what portion relates to repairs

done on the Fabbro Property.  Nelson Testimony, May 13, 10:38:30.

144. Additionally, the testimony of Chubak indicates more of a cosmetic clean up than the

tearing down of walls:

a. Mr. Chubak was concerned on his first walk through about water damage and

mold based upon the physical condition of the home.  This condition is evidenced

by the photographs he took when he first walked through the Property.   Chubak

Testimony, May 5, 2006, 3:38:35; see also Plaintiff's Exhibits 40-58.

b. When Chubak visited the home on or near May 16, 2006, the fireplace shown in

Plaintiff's Ex. 42 had water streaks down it and water residue with streaks every

2-3 inches, the carpet to the left of the fireplace had a loose piece of mildewed

43

carpet 2 inches by 12 inches, the tack strip for the carpet had evidence of water

damage and the subfloor had water staining on it, but no physical deterioration.

The water damage on the subfloor stretched out maybe 6 inches to a foot.  Chubak

Testimony, May 5, 3:41:30; see also Plaintiff's Ex. 42.

c.      Under cross-examination by Mr. Miller, Mr. Chubak testified, as a general

contractor since 2003 in the State of Utah with 24 years of experience focusing on

flooring (Chubak Testimony, May 5, 2006, 3:18:00), that the carpet to the left of

the fireplace in the front room was ruined (Chubak Testimony, May 6, 10:47:00)

there was water damage on the subfloor in the room pictured in Plaintiff's Ex. 42,

wooden tack strips for the carpet in that same room were damaged (Chubak

Testimony, May 6, 2006, 10:51:15).

d.      Moreover, Mr. Chubak indicated that the carpet around the fireplace would have

taken a month or more for the damage to occur (11:06:00), for the plywood

subfloor around the fireplace in Plaintiff's Ex. 42 to become discolored would

have taken a few months to occur (11:07:00 and 11:36:15), for mildew to be on

the floor more than a month would have had to have passed (11:07:30), thus, had

any repairs been done during the three weeks between Chubak's visit to the

Property on May 16, 2006 and the appraiser's visit to the Property on April 24,

2006, to this section of the house, this older water damage would not have been

there.

e.      Mr. Chubak also testified that he could still see evidence of water streaks down

the green wall by the fireplace (Chubak Testimony, May 6, 2006, 10:52:00; see

44

also Plaintiff's Ex 45).

f.    Finally, prior to finishing the basement in the Property, Chubak saw the TGI

support joists below the room in Plaintiff's Ex. 42, and there was no evidence of

any work having been performed.  Chubak Testimony, May 6, 2006, 11:35:00.

There was also no evidence of the tongue and groove subfloor having been

replaced.  Chubak Testimony, May 6, 2006, 11:37:05.

145.    The pictures taken by Mr. Roberts do not show paint peeling away from the walls.

Defendants' Ex. HH.

146.    If water migrates all the way through sheetrock, it can become brittle and may need to be

replaced, however, it does not always need to be replaced and can still be viable without

replacement.  Chubak Testimony, May 6, 2006, 10:54:34.

147.    All of this evidence leads the Court to conclude that the only repairs done by the

Defendants between April 24, 2006 and May 16, 2006 were cosmetic, like drying out the

wet carpet and cleaning the walls.  The testimony and exhibits, specifically the receipts,

do not support major repairs and certainly does not support the Defendants' allegations

that $16,000-$20,000 of repairs were completed (See Nelson Testimony, May 13,

11:09:25).

148.    $16,000-$20,000 of repairs is also unbelievable when you look at the division of monies

from the Chubak sale between the Defendants.  If the testimony from the Defendants is to

be believed, notwithstanding the fact that their receipts do not match their testimony, then

Austin Heywood risked $16,000- $20,000 in order to make a commission of $2,205.  Mr.

Heywood comes across as more savvy of a businessman than that.

149.    Sometime after Mr. Roberts' visit to the Property on April 24 but before the Chubaks'

        visit on May 16, 2006, repairs were made to the Property.  These repairs restored the

        Property to the state it was in when Ms. Fabbro vacated the Property and did not add any

        value to the home.

**POST-CHUBAK CONTRACT REPAIRS**

150.    After Mr. Chubak was under contract to purchase the Property, he met with two

        individuals at the Property to discuss Chubak's concerns.  They poked a hole above the

        fireplace pictured in Plaintiff's Ex. 42, (Chubak Testimony, May 6, 10:09:40), they cut a

        hole in the ceiling pictured in Plaintiff's Ex. 43, (Chubak Testimony, May 6, 10:12:00),

        they looked at the broken garage door spring, (Chubak Testimony, May 6, 10:13:00), they

        looked at some potential mildew in the upstairs bathroom (Chubak Testimony, May 6,

        10:13:15), they addressed the roof and Mr. Chubak requested that they re-tar the area

        outside of the window in Plaintiff's Ex. 54 (Chubak Testimony, May 6, 10:13:45); See

        also Nelson Testimony, May 13, 10:16:10.

151.    The individuals who were at the Property with Mr. Chubak during this walk-through

        indicated that they had done some work to the area outside of the window shown in

        Plaintiff's Ex. 54, but they agreed to add some more tar.  Chubak Testimony, May 6,

        10:17:00.  There was no mention of any other repairs being done to the house during this

        walk through.

152.    After Mr. Chubak was under contract to purchase the Property, the Defendants did repair

        the garage door spring, fixed the holes in the walls that were punched at the request of

        Mr. Chubak and applied some tar to the roof.  See Plaintiff's Ex. 43, Chubak Testimony,

46

May 5, 2006, 3:44:45; See also May 6, 2009 Chubak Testimony, 10:17:45.

153.    Chubak estimated that the work done by the individuals that walked through the Property

probably cost around $500-$1000.  Chubak Testimony, May 6, 2009, 10:21:45.

**DUTIES**

154.    Under the plain language of the Listing Agreement, Heywood, Re/Max Results and the

brokers (Perry and Allphin) owed Ms. Fabbro, a duty of loyalty, full disclosure,

confidentiality, and reasonable care.  Plaintiff's Ex. 2, ¶ 5.

155.    Under the plain language of Utah Administrative Code Rule 162-6, realtors owe duties of

loyalty, obedience, full disclosure, confidentiality, reasonable care and diligence and any

additional duties created by the agency agreement.

156.     Heywood did not disclose to Ms. Fabbro that he was going to make a commission on the

retail side of the transaction through representing the investor group.  Heywood

Deposition, May 6, 2:39:15; 2:40:25.

157.    Heywood also did not disclose to Ms. Fabbro that the investor group would be paying

him (Austin Heywood PC, Inc.) a management fee to maintain her Property after she

moved out.  Heywood Deposition, may 6, 2:41:30.

158.    Heywood only introduced Ms. Fabbro to the Group and did no further marketing for Ms.

Fabbro.  Heywood Testimony, May 6, 2:44:15.

159.    Heywood did not disclose to Ms. Fabbro the purpose of the trust.  Heywood Testimony,

May 6, 2:45:45.

160.    Austin Heywood testified that while he was Ms. Fabbro's Listing Agent, he owed no

obligation to disclose offers on the Property to Ms. Fabbro, if the Property had been

transferred to the Fabbro Residential Land Trust.  Heywood Testimony, May 6, 2:59:10.

161.   Heywood testified that he did not present all of the offers on the Property to Ms. Fabbro

when the Property was not in the Trust. Heywood Testimony, May 6, 2:59:40.

162.   Heywood did not verify whether the trust was created when he received additional offers

on the Property.  Heywood Testimony, May 6, 3:02:15.

163.   Robert Allphin testified that if the buyer defaults under any of the dates set forth in a

REPC it is the agent's duty to then help the seller.  Allphin Testimony, May 14, 3:48:00.

164.   The short sale did not close within 30 days of lender approval.  Heywood, May 14,

4:07:30; see also Plaintiff's Ex. 5.

165.   Heywood did not inform the Debtor of the default set forth in paragraph 163.

## DAMAGES

166.   Ms. Fabbro received notice from Citifinancial, after the sale of the Property to the

Chubaks, that she was liable for the deficiency balance owed on the second mortgage.

Fabbro Testimony, May 5, 2006, 11:04:30 and 2:57:00.

167.   Because of the actions of the Defendants the Debtor was left with an unpaid deficiency

balance owed to IndyMac of at least: $51,908.86 ($381,002.08[this is the payoff as of

March 30, 2006 - additional interest accrued until June 27, 2006] -$329,093.22) and

$14,309.84 to Citimortgage ($20,309.84 - $6,000).

## END RESULT

168.   Knowing of the water streaking in the fireplace room and of water streaking under one of

the windows in an upstairs bedroom, Mr. Chubak and his wife were still willing to

purchase the Property for $441,000.  Chubak Testimony, May 6, 2009, 11:37:30.

48

169.   On June 28, 2006, when the beneficial interest in the Fabbro Residential Land Trust was
transferred from the Debtor to RHB Properties, the value of the Property, which was the
only asset of the Fabbro Residential Land Trust was $441,000.  See Plaintiff's Ex.9, dated
June 27, 2006.

170.   In exchange for the beneficial interest in the land trust, transferred to  RHB Properties by
Ms. Fabbro on June 28, 2006, RHB Properties did not give any money to Ms. Fabbro and
did not give Ms. Fabbro anything else, the short sale alleged to have been given by
Nelson, did not occur.  Nelson Testimony, May 13, 10:25:50.

From the forgoing **FINDINGS OF FACT** and otherwise of good cause appearing, the
Court does now make and adopt the following:

## CONCLUSIONS OF LAW

1.   Utah Administrative Code Rule 162-6 governs licensee conduct for realtors licensed in
the State of Utah.

**First Cause of Action: Fraud**

1.   Tyler B. Ayres dba Ayres Law Firm, Tyler B. Ayres PC, Investors Title Insurance
Agency, Inc., Austin Heywood Jr., William Nelson, Relief Home Buyers LLC dba RHB
Properties, Seth Richmond and Re/Max Results, committed common law fraud against
the Debtor and her creditors.

a.   The above listed defendants, acting in concert, made numerous misstatements and
omissions,  created numerous documents and presented those documents to the
Debtor for the purpose of defrauding the Debtor and her creditors.  Each

49

defendant made the following misrepresentation(s) and/or omissions as well as those set forth in subparagraph (b) through (h) below:

i.  Tyler B. Ayres dba Ayres Law Firm, Tyler B. Ayres PC dba Ayres Law Firm:

- Created Plaintiff's Exhibit 7, the Settlement Statement between Lauren Grames as Borrower and Deborah S. Fabbro as Seller, dated June 28, 2006.  This documents purports to represent the sale of the Property from Fabbro to Grames (hereinafter the "Fictitious Short Sale"), the sale price and the disposition of the sale proceeds, but such a sale never occurred. The Property was instead transferred the day before to Albert and Jennifer Chubak (see Defendants' Exhibit GG).  The sale price was never paid. There was no disbursement of sale proceeds according to the settlement statement.

- Mr. Ayres, through his law firm, took receipt of $420,839.84 of proceeds from the sale of the Property to the Chubaks and disbursed those funds without any notice to or input or instruction from Ms. Fabbro or the Trustee of the Fabbro Residential Land Trust, using them in part to fund payoffs owed to IndyMac and Citimortgage under the Fictitious Short Sale.

- Used 1) the April 5, 2006 Grames Real Estate Purchase Contract, 2) The May 19, 2006 Addendum to the Grames Real Estate Purchase Contract; 3) The June 28, 2006 Settlement Statement showing Grames as the buyer and Fabbro as the seller; 4) The Agreement and Declaration of Trust; 5) The

50

Assignment of Beneficial Interest in Land Trust; 6) the Agreement of

Money Disbursed and Release of All Claims; and  7) the Agreement and

Statement of Understanding; (collectively referred to herein as the "Short

Sale Documents") to defraud the Debtor into transferring all of her interest

in the Property without receiving consideration.

- Failed to disclose to Ms. Fabbro or her lenders that the Property sold for

$441,000 on June 27, 2006.

ii.   Investors Title Insurance Agency, Inc., Troy Ayres:

-  Created the Settlement Statement dated June 27, 2006 between the

Fabbro Residential Land Trust and Albert and Jennifer Chubak.  Exhibit 9.

-  Distributed the proceeds from the transaction represented in Exhibit 9 to

Ayres Law Firm without payment to or satisfaction of the liens against the

Property.  Exhibits 9 and 61.

- Used the Short Sale Documents to defraud the Debtor out of her interest

in the Property and her interest in the sales proceeds from the transaction

identified in Exhibit 9.

- Failed to disclose to Ms. Fabbro or her lenders that the Property sold for

$441,000 on June 27, 2006.

iii.  Austin Heywood Jr., Re/Max Results:

-  On or about March 1, 2006 the Debtor entered into an Exclusive Right

to Sell Listing Agreement & Agency Disclosure ("Listing Agreement")

51

with RE/MAX and its agent Heywood for the purpose of selling the
Property.  Final Pretrial Order ¶ 4o.   See also Plaintiff's Exhibit 2.

- Heywood represented to the Debtor that the Property was to be and was
sold to Lauren Grames when it never did.  Mr. Heywood did not disclose
to Ms. Fabbro that Lauren Grames was the maiden name of Seth
Richmond's wife and his second cousin.

- Mr. Heywood introduced the Debtor to Seth Richmond but did not
disclose to her Mr. Heywood's business relationship with Mr. Richmond
or the investor group or the fact that Heywood would make money through
efforts made by Seth Richmond and his investor group to purchase the
property through a Fictitious Short Sale and actual retail sale of the
Property to a third party buyer.  Fabbro Testimony, May 5, 2006, 2:54:45.

-  On March 6, 2006, Heywood and Re/Max Results listed the Property
"Under Contract" on the Multiple Listing Service ("MLS"), even though
there was no such contract.  Plaintiff's Exhibit 4.

-On May 16, Heywood and Re/Max Results then changes the MLS to
reflect that the Property was no longer under contract.  Exhibit 4.

- Mr. Heywood did not disclose to Ms. Fabbro or obtain approval for the
changes to the listing of the Property on the MLS service, specifically
those changes that did not match the actual events occurring on the
Property.

-On May 18, 2006, the Chubaks put in an offer for the Property for $403,000.  *See* Plaintiff's Exhibit 8.   Heywood received this offer but did not disclose this offer to the Debtor.

-Heywood received on or prior to May 18, 2006 other offers on the Property that he did not disclose to Ms. Fabbro.

-On May 22, 2006, Heywood sends a Multiple Offer Notification to the Chubaks and other offerors interested in the Property.  See Plaintiff's Ex. 77.

- Mr. Heywood failed to disclose to Ms. Fabbro that he had signed his wife's maiden name, as purported Trustee of the Fabbro Residential Land Trust,  to unilaterally accept the offer from the Chubaks which offer was not disclosed to Ms. Fabbro.

-Mr. Heywood failed to disclose to the Debtor that a default by Lauren Grames occurred when Ms. Grames failed to close within the 30 days set forth in her REPC.  Plaintiff's Exihibits 5 and 6.

-Mr. Heywood failed to inform Ms. Fabbro that she has the legal right and opportunity to withdraw from the Grames contract (or not execute an addendum after the $334,000 offer was rejected by her creditors) in order to consider outstanding offers for much greater sales prices.  Mr. Heywood knew of such offers, but failed to disclose the offers to Ms. Fabbro.

- Used the Short Sale Documents to defraud the Debtor out of her interest in the Property.

53

- Failed to disclose to Ms. Fabbro or her lenders that the Property sold for $441,000 on June 27, 2006.

v. Seth Richmond

-  Created Plaintiff's Exhibit 5, presenting an offer to Ms. Fabbro for one Lauren Grames to purchase the Property for $334,000, even though Ms. Grames had no intent of purchasing the Property.  See Plaintiff's Ex. 5.

- Failed to disclose that Lauren Grames was his spouse, using her maiden name, that he had signed her name on the REPC and that the REPC was a self-serving document for the benefit of Mr. Richmond and the investment group to be used to negotiate the Fictitious Short Sale of the Property for less than its value.

- Obtained signatures from Ms. Fabbro on Plaintiff's Exhibits, 6, 7, 11, 12, 13, 14 and 35 without explaining the purpose of those documents, and under the false pretense that they were needed for further negotiations with the banks to complete the Fictitious Short Sale.

- Seth Richmond told the Debtor that the investment group would purchase the Property.  Richmond Testimony, May 13, 11:25:00.

- Neither Lauren Grames nor any of the other Defendants had any intent to purchase the Property.

-Neither Lauren Grames nor any of the other Defendants purchased the Property

- Failed to disclose the true and self-serving nature of the residential land
trust and that the trust was solely for the protection of and control of the
Property and its title for the benefit of the investment group.

- Used the Short Sale Documents to defraud the Debtor out of her interest
in the Property.

- Failed to disclose to Ms. Fabbro or her lenders that the Property sold for
$441,000 on June 27, 2006.

vii.  William F. Nelson, Relief Home Buyers, LLC dba RHB Properties:

-Represents to Ms. Fabbro's banks, on behalf of Ms. Fabbro that a short
sale was going to occur between Fabbro and Grames

- Completed legal documents without the authorization, review or
approval of the Debtor.

- Had no intent to purchase the Property through the Grames REPC as it
was riddled with ways to get out.

-Used the Fabbro/Grames contract which he knew to be a document for a
fictitious short sale for the benefit of his own investor group and to
negotiate a short sale with the Debtor's creditors at a price less than value
and less than offers received on the Property.

- Used the Short Sale Documents to defraud the Debtor out of her interest
in the Property.

- Failed to disclose to Ms. Fabbro or her lenders that the Property sold for
$441,000 on June 27, 2006.

- Instructed the closing of the Chubak purchase of the Property and teh

disbursement of the Chubak sale proceeds in contradiction of the Fictitious

Short Sale to evade the valid liens of Ms. Fabbro's creditors, causing

damage to the debtor.

b.    The above named defendants, acting in concert through Seth Richmond, made

numerous misrepresentations to the Debtor including, 1) that Lauren Grames was

interested in purchasing the Property; 2) that there were no other offers on the

Property; and  3) that the sale of the Property to Lauren Grames closed.

c.    The above named defendants, acting in concert, withheld from the Debtor and her

creditors, the Chubak offer and closing of that offer to purchase the Property for

$441,000.

d.    The short sale of the Property to Lauren Grames for $352,000, never closed, but

the above named defendants represented to the Debtor and her creditors that this

closing occurred on June 28, 2006.

e.    The Property was actually sold to the Chubaks on June 27, 2006 for $441,000.

f.    The above named defendants did not disclose the Chubak closing to the Debtor or

her creditors.

g.    The above named defendants used some of the proceeds from the Chubak sale, to

pay the Debtor's creditors the amounts promised from the Fictitious Short Sale.

h.    The above named defendants disbursed the equity from the Chubak sale to or for

themselves and to or for all of the remaining defendants.

56

2.     The  Debtor and her creditors reasonably believed and relied on the representations and

documents showing that the Property would be sold to Lauren Grames.

3.     The Debtor and her creditors' reliance on the representations related to the Property

resulted in injury and damage to the Debtor and her creditors to which the Debtor (or the

Debtor's bankruptcy estate) is liable.

4.     The Debtor and her creditors suffered $105,906.78 in actual damages as a result of the

fraudulent conduct by the Defendants, **$91,394.35 of which went directly into the**

**Defendants' pockets**.

**Second Cause of Action:  Fraudulent Transfer, 11 U.S.C. §548(a)(1)(B)(I)**

1.     The Debtor's transfer of the Property including her transfer of the beneficial interest in

the Fabbro Residential Land Trust on June 28, 2006, to the Defendants  is avoidable

under 11 U.S.C. §548(a)(1)(B)(i).

   a.     On June 28, 2006, the value of the beneficial interest in the Property/Fabbro

Residential Land Trust was at least $89,000 (the difference between the alleged

Grames closing of $352,000 and the actual closing by the Chubaks of $441,000).

   b.     The Defendants did not give any value in exchange for the transfer of the

beneficial interest (the $89,000) in the Property/Fabbro Residential Land Trust.

   c.     RHB Properties was the initial transferee of the beneficial interest in the

Property/Fabbro Residential Land Trust, but all of the Defendants were the parties

for whose benefit the transfer was made, or subsequent transferees of the $89,000.

   d.     Pursuant to 11 U.S.C. §550(a), the Trustee can recover the value of the transfer

from all of the Defendants as they were the parties for whose benefit the transfer

57

was made.  The defendants all participated directly or indirectly in receiving the benefit of the fraudulent transfer.

e.      None of the Defendants gave value to the Debtor or satisfaction of indebtedness to her creditors in exchange for the transfer.

f.      Any repairs made to the Property by or for the Defendants did not increase the value of the Property, different from the value when the beneficial interest was transferred.

g.      The Debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer as her assets were less than her debts as shown in her statements and schedules, and the lack of any material transfers of assets during the one and a half months between the transfer and the filing of Fabbro's bankruptcy petition.

h.      The defendants' scheme or devise resulted in the defendants skimming off $89,000 of the equity or value of the Property for no consideration to the Debtor including no satisfaction of indebtedness.

i.      The defendants are not entitled to any defense under Section 550(e)(1) of the Bankruptcy Code for any increase of value to the Property on account of alleged repairs because they were never good faith transferees of the Property because they never paid consideration for the Property and were never transferees of the Property as required by Section 550.

**Third Cause of Action:   State Law Fraudulent Transfer Act**

1.    The Debtor's transfer of the Property including her transfer of the beneficial interest in

the Fabbro Residential Land Trust on June 28, 2006, to the Defendants  is avoidable

under Utah Code Ann. Section 25-6-6?

     a.    The Debtor's transfer of the Property including her transfer of the beneficial

interest in the Fabbro Residential Land Trust on June 28, 2006, to the Defendants

was the transfer of an "asset" within the meaning of Utah Code Ann. §25-6-2(2).

     b.    On June 28, 2006, the value of the beneficial interest in the Property/Fabbro

Residential Land Trust was at least $89,000.

     c.    The Defendants did not give any value in exchange for the transfer of the

beneficial interest in the Property/Fabbro Residential Land Trust or for their

receipt of the $89,000 of the sales proceeds.

     d.    RHB Properties was the initial transferee of the beneficial interest in the

Property/Fabbro Residential Land Trust, but all of the Defendants were the parties

for whose benefit the transfer was made.

     e.    Pursuant to 11 U.S.C. §550(a), the Trustee can recover the value of the transfer

from all of the Defendants as they were the parties for whose benefit the transfer

was made.

     f.    None of the Defendants gave value to the Debtor or her creditors in exchange for

the transfer or their receipt of the $89,000.

     g.    No repairs performed by the Defendants or on behalf of the Defendants resulted in

any increase in value to the Property.

h.    The Debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer as her assets were less than her debts as shown in her statements and schedules, and the lack of any material transfers of assets during the one and a half months between the transfer and the filing of Fabbro's bankruptcy petition.

**Fifth Cause of Action:   Negligence**

1.    RE/MAX, Heywood, Perry, Allphin, Troy Ayres, Investors Title, Ayres Law Firm and/or Tyler B. Ayres, PC and Richmond are liable to the Debtor and her creditors for negligence.

a.    Re/Max Result, Heywood, Perry and Allphin owed the Debtor a duty to follow the golden rule and act in the best interests of the client, including duty of loyalty, duty of obedience, and full disclosure including  all offers on the Property up until the sale of the Property closes.  Heywood Testimony, May 6, 11:58:20.

b.    Troy Ayres, Investors Title Insurance Agency Inc., Ayres Law Firm, Tyler B. Ayres PC, Bill Nelson and Tyler Ayres owed the Debtor a duty to hold safe and account for all money or property entrusted at the Chubak closing.  Heywood Testimony, May 6, 12:01:30.  See also Utah Admin. Code R162-6 paragraph 6.2.15.

b.    The above named defendants breached the above described duties by failing to disclose all offers on the Property to Ms. Fabbro and by misappropriating the funds from the Chubak closing.

c.    The breach of those duties was the proximate cause of the Debtor's injuries.

60

    d.    The plaintiff in fact suffered injuries or damages through the breach of these duties by incurring deficiency balances to her creditors and not realizing the full benefit of the Chubak sale.

**Sixth Cause of Action:  Punitive Damages**

1.    An award of punitive damages is appropriate against the defendants involved in the common law fraud set forth above, for the following reasons:

    a.    The conduct of the defendants, in committing the common law fraud outlined above was willful and malicious and/or intentionally fraudulent and/or conduct that manifests a knowing and reckless indifference towards, and a disregard of the rights of the Debtor.

    b.    The Debtor and her creditors suffered $105,906.78 in damages directly from the misappropriation of the sales proceeds from the Property,  **$91,394.35 of which went directly into the Defendants' pockets**, plus accrued attorneys' fees in prosecuting this matter, plus the Debtor suffered additional monetary damages in the amount of $900 because of the Chapter 7 bankruptcy petition she was forced to file after being left with the deficiency balances being owed to the first and second lien holders on the Property.

    c.    Punitive damages in the amount of $1,000,000 (the size of this damage amount is significant to ensure that the conspirators are punished) should be awarded to the Plaintiff to deter the Defendants, who have already conducted hundreds of short sales, from committing these injustices in the future.   Each defendant that participated in the conspiracy and profited from the conspiracy is jointly and

severally liable for the punitive damage amount to deter such conduct in the
future.

**Seventh Cause of Action:  Civil Conspiracy**

1.      The Defendants are jointly and severally liable for the damages caused to the Defendant
because their actions constituted a civil conspiracy.

     a.      The defendants combined in committing fraud against the Debtor and her
creditors.

     b.      There was a meeting of the minds between the Defendants as to their fraud against
the Debtor and her creditors.

     c      The common law fraud committed by the Defendants constitutes an unlawful,
overt act.

     d.      The Debtor and her creditors were damaged.

     e.      The fraud by the defendants was the proximate cause of the damages suffered by
the Debtor and her creditors.

     f.      The defendants participating in the common law fraud consciously and knowingly
participated in the conspiracy or participated in the distribution of the ill-gotten
gains from the conspiracy.

**Eighth Cause of Action: Breach of Contract**

1.   A contract existed between Ms. Fabbro, Re/Max Results, Steve Perry, Robert Allpin and
Austin Heywood, as evidenced by the Listing Agreement.

2.  Re/Max Results, Steve Perry, Robert Allpin and Austin Heywood breached that contract by
failing to fully disclose all of the offers presented on the Property and failing to inform Ms.

Fabbro of her rights because of Ms. Grames default under the April 5, 2006 REPC and addendums.

3.  Ms. Fabbro suffered damages as a result of the breach as she was left with a deficiency balance owed to her creditors.

4.  Ms. Fabbro suffered damages of $105,906.78,  $91,394.35 of which went directly into the Defendants' pockets.

**Miscellaneous Conclusions of Law related to Proofs of Claim in Plaintiff's Ex. 64 and 65**

1.  Section 501(c) of the Bankruptcy Code permits the Trustee of a bankruptcy estate to file a proof of claim for a creditor at any time.

2.  In order for the proof of claim to be considered timely filed under Section 726(a)(2)(B) of the Code, the trustee must file the proof of claim for the creditor within 30 days after the deadline for the filig of timely filed claims pursuant to Federal Rule of Bankruptcy Procedure Rule 3004.

3. If the proof of claim filed by the Trustee for the creditor is filed after the 30 days after the deadline, the proof of claim will be considered "tardily filed" under Section 726(a)(3) of the A  Bankruptcy Code.

4.  A tardily filed proof of claim is allowed under Section 502 of the Bankruptcy Code and participates in any distribution of property of the estate pursuant to Section 726 of the Bankruptcy Code.

    Submitted this 3rd day of June, 2009.


                                        /S/ Jeremy C. Sink
                                        Jeremy C. Sink
                                        Counsel for Plaintiff

63

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Proposed Findings

of Fact and Conclusions of Law were delivered, this 3rd day of June, 2009, to the following persons:


    Blake D. Miller
    Joel T. Zanger
    MILLER GUYMON, P.C.
    165 Regent Street
    Salt Lake City, UT 84111
    (Via ecf)
            /S/ Jeremy C. Sink