**The below described is SIGNED.**

**Dated: July 29, 2009**  _William J. Thurman_



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Chief Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | |
| **Deborah Sue Fabbro, aka** **Deborah S. Fabbro-Voight**, | Case No. 06-23005 Chapter 7 |
| Debtor. | |
| | |
| **Stephen W. Rupp, Trustee of the** **Bankruptcy Estate of Deborah Sue Fabbro**, | |
| Plaintiff, | Adversary Proceeding No. 07-2002 |
| v. | Judge William T. Thurman |
| **Tyler B. Ayres, et al.**, | |
| Defendants. | |

## MEMORANDUM DECISION

The above-entitled matter came on regularly for trial on May 5, 6, 13, 14 and June 10,

2009 before the Honorable William T. Thurman, Chief Judge, United States Bankruptcy Court

for the District of Utah.  The Plaintiff, Stephen W. Rupp, Trustee of the Bankruptcy Estate of

1

Deborah Sue Fabbro, appeared and was represented by Jeremy C. Sink and Nickolas S. Rice of

McKay, Burton & Thurman.  The Defendants, William F. Nelson and Brenda Nelson appeared

*pro se.*  The remaining Defendants appeared and were represented by Blake D. Miller of Miller

Guymon, P.C.  The Court, after considering all of the testimony adduced at trial, the exhibits, the

pleadings, the oral argument of the parties, and the court papers on file hereby issues the

following Memorandum Decision which will constitute the Court's Findings of Fact and

Conclusions of Law as required by Fed. R. Civ. P. 54.

## I.    JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and

157(b)(2)(E) and (H).  Venue is appropriate under 28 U.S.C. § 1409(a).

## II.    FINDINGS OF FACT

This proceeding was initiated by the chapter 7 Trustee, Steven W. Rupp ("the Trustee").

The case was initiated by the Debtor, Deborah Sue Fabbro ("Fabbro"), who filed a petition under

chapter 7 on August 15, 2006.  The Trustee is pursuing causes of action against Tyler B. Ayres,

dba Ayres Law Firm; Tyler B. Ayres PC; Investors Title Insurance Agency, Inc.; Austin

Heywood, Jr.; Inferno, LLC; William F. Nelson; Brenda Nelson; Chris Patterson; Relief Home

Buyers, LLC dba RHB Properties; Seth Richmond; RE/MAX Results, LLC; Troy Ayres; Becky

Heywood aka Becky Sturzenegger; Steve Perry; Tyra S. Ayres; and Robert Allphin (collectively

"the Defendants") for common law fraud,[1] fraudulent transfer under § 548 of the Bankruptcy

---

[1]At the conclusion of the Plaintiff's case at trial, the Court granted the Defendants' motion to
dismiss the first cause of action (common law fraud) as to Tyra S. Ayres, Troy Ayres, Brenda Nelson,
Becky Sturzenegger, Steve Perry, and Robert Allphin.

Code,[2] fraudulent transfer under Utah Code Ann. § 25-6-6, negligence,[3] civil conspiracy, and

breach of contract.[4]  The Trustee is also seeking an award of punitive damages.[5]

An understanding of the time line of events in this matter is critical.  In April 2004,

Fabbro and her husband, Daniel J. Voight ("Voight"), bought a house located at 13658 South

Bridle Trail Road in Draper, Utah ("the Property") for $335,000.  Voight handled the

negotiations for the purchase and financing of the Property, with Fabbro simply signing

documents at closing.  The Property was purchased with 100% financing.

In January 2005, Fabbro and Voight divorced and she was awarded the Property in the

divorce decree, subject to the existing mortgage.  Fabbro found it difficult to make the house

payments and she listed the Property for sale through a listing agent in November 2004 at a

listing price of $399,000.  Although she reduced the asking price from $399,000 to $379,900 in

February 2005, she received no offers on the Property.

In July 2005, Fabbro decided to take the Property off the market in order to refinance it.

As part of the refinance process, an appraisal was obtained indicating a value of $380,000.  On

August 26, 2005, Fabbro obtained a $361,000 mortgage from MortgageIt, Inc. (which was later

---

[2]Unless otherwise indicated, all statutory references herein are to the Bankruptcy Code.

[3]At the conclusion of the Plaintiff's case at trial, the Court granted the Defendants' motion to dismiss the fifth cause of action (negligence) as to Tyra S. Ayres, Troy Ayres, Brenda Nelson, Becky Sturzenegger, Steve Perry, and Robert Allphin.

[4]Causes of action for unlawful dealing of property by a fiduciary and alter ego/veil piercing and reverse piercing were dismissed by the Court on November 25, 2008 pursuant to a motion for summary judgment filed by the Defendants.  At the conclusion of the Plaintiff's case, a breach of contract cause of action was allowed by the Court to conform to the evidence presented.  However, the Plaintiff's motion to amend the complaint to include a cause of action for breach of fiduciary duty was denied.

[5]The Defendants argue that the Trustee is assailing the residential short sale industry at large. The Court is persuaded, however, that the Trustee is challenging this alleged short sale only.

transferred to IndyMac Bank).  This new loan was an adjustable rate mortgage which contained a

prepayment penalty clause.  A first deed of trust was recorded to secure the loan.  On September

13, 2005, Fabbro obtained a $19,000 home equity line of credit from Citibank Federal Savings

Bank ("Citibank" or "Citimortgage") which was secured by a second deed of trust against the

Property.[6]  The sum of the two mortgages equaled the appraised value of the Property.

Fabbro was able to make the new house payment for a time while receiving financial

support payments from Voight, but when the support payments ceased she was unable to make

the mortgage payments and pay her other obligations.  By December 2005 or January 2006, she

entirely stopped making her mortgage payments and elected to list the Property for sale with

another realtor at a listing price of $399,900.  During this listing, she entertained one serious

offer.  To close on this offer, however, she needed concessions from her lenders (including a

waiver of the prepayment penalty by IndyMac Bank).  IndyMac Bank refused and the sale fell

through.

By this time, Fabbro was distraught and fearful of immediate eviction.  Several months

behind on her mortgage payments, she decided to list the Property with yet another realtor.  She

was referred by her tax advisor to one of the Defendants, Austin Heywood, Jr. ("Heywood"), a

real estate agent with RE/MAX Results, LLC ("RE/MAX"), who was represented to be

experienced and very familiar with short sales of residential properties.[7]

---

[6]The Court uses "Citibank" and "Citimortgage" interchangeably in this Memorandum Decision
even though they may have distinct legal identities because that is how the parties have referred to this
creditor throughout this adversary proceeding.  The most likely correct name is "Citimortgage."

[7]The Court frequently refers to "short sales" and "retail sales."  A short sale is, in its simplest
definition, a sale by a willing seller to a willing buyer for less than the total encumbrances on the home
with the consent of the underlying lienholders who agree to take less than what they are owed.  Short
sales generally occur when the value of the home is less than the total consensual encumbrances.  The

Anxious to get out from under her home debt, Fabbro contacted Heywood by telephone in February 2006 and informed him that she wanted to avoid a foreclosure.  During the conversation, Heywood indicated that he knew a group of short sale investors who might be interested in purchasing the Property ("the Investor Group").  Heywood did not disclose to Fabbro that he was a member of the Investor Group or that she could be left with a deficiency if the Property was purchased by the Investor Group.

On March 1, 2006, at Heywood's suggestion, Fabbro met with a member of the Investor Group, Seth Richmond ("Richmond"),[8] and completed the paperwork to list the Property with RE/MAX and its agent, Heywood.  Fabbro's listing agreement with RE/MAX and Heywood set forth an aggressively reduced listing price of $344,900.  At this initial meeting, Richmond presented numerous short sale documents for Fabbro's signature.[9]  She refused to sign the documents except to authorize the Investor Group to obtain information from her lenders.

Richmond continued to act as a facilitator between Heywood, Fabbro and the rest of the Investor Group and met numerous times with Fabbro in person and by telephone.  During these meetings, he often assured her that pursuing a short sale was her best course of action.  Richmond

---

lienholders do not generally waive  their deficiency balances in this process.  When properly executed, a short sale benefits the seller by getting him or her out from under the constant fear and stress of foreclosure.  A short sale benefits the lender by getting the distressed property sold quickly; thereby allowing the lender to quantify its loss without the time and expense of a foreclosure.  A short sale may benefit investors by allowing them to buy properties at distressed prices and, when market conditions improve, sell the properties and make a profit.  As discussed herein, the short sale in this case was intended to be between Fabbro and Lauren Grames.  The retail sale occurred between the Fabbro Residential Land Trust and Albert and Jennifer Chubaks.

[8]Richmond was not a licensed realtor, but was merely a business associate of Heywood.

[9]Documents presented to Fabbro for signature on March 1, 2006 included an Agreement and Declaration of Trust, Agreement of Money Disbursed and Release of All Claims, Agreement and Statement of Understanding, and a Warranty Deed transferring the Property from Fabbro, individually, into the Fabbro Residential Land Trust.

also explained that Fabbro would be liable to her lenders for any monies owed after a short sale,

but reassured her that he had never seen a lender come after someone to recover a deficiency.  A

relationship of trust developed between Fabbro and Richmond.

Sometime after Fabbro met with Richmond on March 1, 2006, Heywood came to the

Property to take pictures of the house.  Heywood testified that the home looked good and

"showed well."  Heywood also discussed the short sale process with Fabbro at this time.

Heywood told Fabbro that the Investor Group would establish a trust as part of the short sale, but

he did not explain to her the purpose of the trust.[10]

Other than introducing Fabbro to Richmond, Heywood conducted no further marketing

efforts for Fabbro for the sale of the Property.  On March 6, 2006, Heywood listed the Property as

"under contract" on the Multiple Listing Service ("MLS") even though there was no contract on

the Property at that time.  In effect, Heywood chilled any inquiry or disinterested prospective offer

on the Property.  From this point forward, Heywood's marketing efforts were conducted solely for

the Investor Group and the prospective retail side of the transaction.

Near the end of March or the first week of April 2006, Fabbro moved out of the Property.

She left the Property clean and in good condition.  On April 5, 2006, Heywood obtained the

signature of Lauren Grames (another member of the Investor Group and Richmond's spouse) as a

buyer for the Property.  Ms. Grames executed and delivered a Real Estate Purchase Contract for

the Property in the amount of $334,000 (the "Grames REPC").  Grames testified that she had no

---

[10]Richmond's subsequent explanation to Fabbro with regard to the trust was simply that it was the best vehicle for accomplishing a short sale.  Richmond failed to disclose that the trust was solely for the benefit and protection of the Investor Group.  The Defendants' expert witness, E. Hil Margolin, testified that the purpose of a trust in a short sale is to enable the investor to quickly react to any offer by having a ready and available trustee in place.

independent ability to buy the Property, nor did she have a commitment from any lender to finance the acquisition.  She also had no intent to hold or buy the Property on her own behalf.

The Grames REPC was presented to Fabbro by Richmond.  Fabbro was unaware that Grames and Richmond were husband and wife and Richmond never disclosed this fact to her. Enormously relieved to have a potential buyer, and believing she was accepting a legitimate offer, Fabbro signed off on the Grames REPC, subject to lender approval.

In addition to Heywood, Richmond, and Grames, the Investor Group was made up of other individuals who had experience with residential short sales.  One of these individuals, William F. Nelson ("Nelson"), obtained a copy of the Grames REPC from Richmond and presented it to Fabbro's lenders for their review and approval as part of a short sale package.[11]  The holder of the first mortgage, IndyMac Bank, refused the offer contained in the Grames REPC on May 17, 2006 based upon the appraisal it obtained on April 24, 2006 which valued the Property at $352,000.

On May 18, 2006, Grames signed an addendum to the Grames REPC (the "Grames Addendum") which increased the purchase price for the Property to $352,000.  Richmond presented the Grames Addendum to Fabbro on May 19, 2006 and she signed and accepted it, again believing it was a legitimate offer.  Richmond assured Fabbro that this sale would most likely close and that she could move on with her life without threat of foreclosure.

As of May 19, 2006, Fabbro had not executed all of the Investor Group's short sale documents, yet, Nelson and his office continued to contact IndyMac Bank and Citimortgage

---

[11]Nelson testified that a typical short sale package contains a preliminary settlement statement and personal financial information for the seller, such as bank statements, pay stubs, financial statements, tax returns and a hardship letter.  Nelson learned the particulars about short sales while attending a seminar in Nashville, Tennessee in 2005.  This was also where he and Heywood met.  Nelson and Heywood subsequently affiliated on numerous short sale transactions in Utah.

regarding the Grames Addendum.  On May 31, 2006, IndyMac Bank agreed in writing to a

$352,000 short sale.  Citimortgage did not agree to the $352,000 short sale until it issued a letter

dated July 5, 2006.

     In April 2006, after Fabbro had moved out of the house, Nelson visited the Property for the

first time and found water damage in the unfinished basement, water stains on the walls and

ceiling in a family room on the main level, wet carpet in that same room, and wet carpet in two

upstairs bedrooms.  Nelson visited the Property a second time in April with a contractor, Glen

Holman ("Holman"), to look at the damage and effect some repairs.

     Relief Home Buyers, LLC dba RHB Properties ("RHB")[12] and/or Inferno, LLC

("Inferno")[13] hired Holman to make some repairs to the Property.  Holman and his employees

completed some level of work on the Property between April 24, 2006 (the date of the IndyMac

Bank appraisal) and May 16, 2006.  The extent and dollar value of those repairs was hotly

contested at trial.  The Defendants maintain that the Investor Group made $16,000 to $20,000

worth of repairs to the Property.  The Plaintiff, on the other hand, argues that Holman's repairs

were cosmetic and insubstantial.  The testimony presented regarding the repairs was contradictory

and the documentary evidence produced consisted of receipts for materials purchased by Holman

for multiple jobs and wages paid to Holman and his employees for multiple projects.[14]  Based upon

---

[12]William F. Nelson and Brenda Nelson are the sole members of RHB.

[13]Inferno is controlled by Becky Sturzenegger (Heywood's wife) and Tyra S. Ayres (wife of Tyler Ayres).  Tyler Ayres is the registered agent of Inferno.  Tyler Ayres is also the owner of Investors Title Insurance Agency, Inc., which closed the Chubak sale.

[14]Holman testified that he was involved in repairing and/or updating five to six other properties for Nelson at this time and no differentiation of repair costs was kept for this location.  Holman testified about his costs on this project, but his testimony was uncertain and ambiguous and generally not helpful in determining what, if any, costs related to the Property.

the testimony and other evidence presented, the Court finds that less than $1,000 was spent by the Investor Group to prepare the Property for resale.

In mid-May 2006, Heywood changed the listing on the MLS to indicate that the Property was no longer under contract.  Heywood now wanted to sell the Property to a legitimate buyer in order to make a profit for himself and the other members of the Investor Group.  Albert and Jennifer Chubak ("the Chubaks") saw that the Property was listed for sale on May 16, 2006 on the Internet.  The Chubaks were looking for a home in the Draper area and had been searching real estate web sites on a regular basis for several weeks without success.  Upon seeing the revised Fabbro listing, Mr. Chubak drove to the Property that same night to view the home.  The Chubaks returned to the Property with their real estate agent the next day to conduct a preliminary inspection and take pictures of the inside of the home.  Based upon their inspection, the Chubaks made an immediate verbal offer for $380,000.[15]

The real estate market for residential properties in the Salt Lake valley in the spring of 2006 was becoming explosive.  Inventory was lowering, demand was rising, and home values were increasing at an accelerated rate.[16]  On May 18, 2006, Heywood informed the Chubaks that the $380,000 offer was not acceptable (even though it was much higher than the previous listing price

---

[15]The Defendants dispute that the Chubaks ever made an offer for $380,000.  Mr. Chubak testified regarding this fact, however, and the Court finds his testimony credible.  Mr. Chubak had no prior connection to any of the parties in this proceeding and no reason to misstate this fact.  He simply wanted to purchase the Property.  Also, Exhibit 4 (a property activity report) shows that the listing price changed to $423,700 on June 15, 2006.  However, Heywood stated that this activity report was not completely accurate.  With contradictory evidence as to the listing price as of May 16, 2006, the Court finds that the listing price when the Chubaks made their $380,000 offer was $423,700 as there was no reason for the Chubaks to make a premium bid as a first offer.

[16]Based upon her testimony, it appears that Fabbro was oblivious to this situation.  However, Heywood, Richmond, Nelson and other members of the Investor Group were savvy investors who, in the Court's opinion, were very familiar with the changing market.

of $344,900).  The Chubaks thereupon increased their offer to $403,000.

The Chubaks' second offer was discussed between Heywood, Nelson and other members of the Investor Group, but was not presented to Fabbro (despite the fact that IndyMac Bank had rejected the Grames offer on May 17, 2006 and the Grames Addendum had not yet been presented to Fabbro).  Heywood acknowledged the Chubaks' second offer on May 22, 2006 by sending a Multiple Offer Notification[17] and informing them that their $403,000 offer was not acceptable. Heywood suggested that the Chubaks make a final and best offer and, on May 23, 2006, they submitted a third offer for $441,000.[18]  Heywood also failed to present this offer to Fabbro.  Instead, he accepted the offer on behalf of the Investor Group on May 24, 2006 by signing his wife's name, Becky Sturzenegger, as the purported trustee of the Fabbro Residential Land Trust (the "Trust").[19] Heywood then set in motion the process for closing on the Chubak sale.[20]

As of May 24, 2006, legal and equitable title to the Property was held by Fabbro.  When Heywood accepted the Chubaks' offer by signing his wife's name as trustee for the Trust, the Trust did not exist.  Documents creating the Trust, naming Chris Patterson (not Becky Sturzenegger) as trustee, and giving Fabbro a 100% beneficial interest in the Trust were not executed or recorded

---

[17]This type of notice is customarily used by listing agents to notify prospective buyers that others have made offers on the same property.

[18]Chubak testified that he really wanted the Property by this time and was willing to up the ante to insure that he got it.

[19] Becky Sturzenegger was a putative trustee for a trust that did not exist at that time.

[20]It was always Fabbro's understanding that the Property was being sold to Grames for $352,000. Fabbro learned of the Chubaks' $441,000 offer and the Chubaks' June 27, 2006 closing for the first time when the Trustee initiated this adversary proceeding.

until June 12, 2006.[21]

On June 27, 2006 (one day prior to the alleged settlement date for the Property to be sold by Fabbro to Grames), the Chubaks closed on their purchase at Investors Title Insurance Agency, Inc. ("Investors Title"),[22] tendered the purchase price of $441,000 plus closing costs, and signed their settlement documents. On this same date, Chris Patterson, trustee for the Trust, executed a warranty deed transferring the Property from the Trust to the Chubaks, even though he had no beneficial title. The warranty deed was recorded with the Salt Lake County Recorder's Office on June 28, 2006.

Notwithstanding the signing of documents between the Chubaks and the Trust on June 27, 2006, Richmond provided Fabbro with a Settlement Statement dated the next day, June 28, 2006 which purported to represent the purchase of the Property by Grames. However, no other documentary evidence was presented to the Court to support that a closing or transfer of the Property from Fabbro to Grames ever took place.[23] Fabbro did not attend a closing for the Property. Grames neither attended a closing for the Property nor tendered any purchase price. From the testimony and evidence presented, the Court finds and concludes that Grames had no intent of purchasing the Property or financing it. She was merely acting as a shill. The Court further finds

---

[21]Fabbro executed the following documents on June 12, 2006: the Agreement and Declaration of Trust, Agreement of Money Disbursed and Release of All Claims, Agreement and Statement of Understanding, and a Warranty Deed transferring the Property from Fabbro, individually, into the Fabbro Residential Land Trust.

[22]Tyler Ayres is the owner of Investors Title. Troy Ayres, his brother, is the licensed escrow officer who closed the sale between the Trust and the Chubaks.

[23]The Defendants contend that both the Grames sale and the Chubak sale closed on June 28, 2006. In addition, they argue that the timing of the alleged short sale and the retail sale is not critical and that lack of a deed transferring the Property to Grames prior to the Chubak sale is irrelevant. The Court disagrees.

11

that no short sale occurred.[24]

After the Chubak sale closed, Fabbro signed a settlement statement presented to her by Richmond on June 28, 2006 and executed an assignment whereby she assigned her 100% beneficial interest in the Trust to RHB.[25]  Approximately 6 weeks later, she filed for chapter 7 bankruptcy protection.[26]

It is apparent to the Court, and the Court so finds, that the Investor Group needed the financing provided by the Chubak sale in order to close on the alleged Grames sale.  The Investor Group either did not have sufficient funds prior to that time to pay off the underlying lienholders, or they elected not to use their own money to do so.  With the Chubak money, which was deposited on June 28, 2006 in a special escrow account maintained by the law firm of Tyler B. Ayres, the Investor Group was able to pay off Fabbro's lenders at the previously agreed upon sums and pay themselves and their agents significant amounts of money.

Proceeds from the sale of the Property to the Chubaks were disbursed by Investors Title as

---

[24]The Defendants argue that a short sale occurred between Fabbro and Grames on June 28, 2006 when Fabbro assigned her 100% beneficial interest in the Trust to RHB.  The Court disagrees.  No deed, financing or other closing documentation evidenced a sale between Fabbro and Grames on that date.

[25]See supra note 12.

[26]When Fabbro filed for bankruptcy on August 15, 2006, she scheduled IndyMac Bank as an unsecured creditor with a $362,044.58 claim, Citimortgage as an unsecured creditor with a $20,000 claim, and an additional $31,831.64 in other unsecured claims.  She listed an additional $10,889 in secured claims, but scheduled no priority claims.  Fabbro listed her assets as $16,833.  Accordingly, she was insolvent as of the date of the petition.  She was also insolvent on the date of the relevant transactions discussed herein or was rendered insolvent as a result of the transfers.  Fabbro received a discharge on November 15, 2006.  On October 1, 2008, the Trustee filed proofs of claim on behalf of IndyMac Bank in the amount of $58,308.85 and Citimortgage in the amount of $14,309.84.  The Trustee contends that both unsecured creditors are entitled to be paid to the extent there are funds remaining after all timely and allowed claims are paid.  The Defendants argue that these claims are time barred and weaken the Trustee's arguments in this proceeding.  The Court determines that it is premature to make findings as to the allowance of these proofs of claim.  Whether these claims satisfy the requirements of the Utah Uniform Fraudulent Transfer Act is treated hereafter.

follows:

a.   $2,205           RE/MAX[27]

b.   $3,442.73        Investors Title

c.   $420,839.84      Ayres Law Firm (special escrow account)

After paying IndyMac Bank $329,093.22 and Citimortgage $6,000, the remaining proceeds

deposited in the special escrow account were divided between the Defendants[28] as follows:

Seth Richmond         $22,156.57

Ayres Law Firm        $1,510

William F. Nelson      $16,143.33

Brenda Nelson         $6,901.60

Chris Patterson       $2,000

Inferno               $24,593.69

RHB                   $6,901.60

With the exception of RE/MAX, Investors Title, IndyMac Bank and Citimortgage, Fabbro

had no knowledge that the individuals and entities listed above would be paid the amounts set forth.

**DISCUSSION**

This entire case is essentially a "bait and switch" scenario.  Fabbro, a distressed

---

[27]This amount was actually paid to Heywood, not RE/MAX.  Heywood testified that he has a
very favorable arrangement with RE/MAX and that this amount is what he expected out of this
transaction.

[28]The evidence indicates that except for the payment to Ayres Law Firm, there was no correlation
between these payments and the services or materials provided by the recipient.  According to Nelson,
who authorized the disbursements, these payments were mainly accrued and unpaid obligations owed by
the Investor Group.

13

homeowner, believed that she hired a team of experienced professionals to help sell her home in

Draper in the spring of 2006. In reality, she was unrepresented within days of signing the listing

agreement after Heywood switched hats without her knowledge and began marketing the Property

for the Investor Group.[29] In effect, Heywood baited Fabbro into signing with him for the benefit of

the Investor Group where he purported to represent her best interests and then switched his

allegiance. In fact, the Court cannot conclude that Heywood ever had Fabbro's best interests in

mind during any of the time following his initial contact with her.

The Defendants testified that their actions with respect to Fabbro were nothing less than

reasonable business practice and the norm for short sales. Had there been full, fair, and prompt

disclosure of all material information in this case, including a proper explanation to Fabbro of the

Investor Group's short sale practices, the Court might agree.[30] Here, however, Fabbro and

Heywood had almost no contact with each other after their initial meeting at the Property in March

2006, and the information supplied to Fabbro by Richmond during their subsequent meetings was

often vague and misleading.

Fabbro knew nothing, for example, about Heywood's involvement in the Investor Group or

his shifting loyalties. She knew nothing about the husband and wife relationship between Grames –

the putative buyer – and Richmond (which might have raised a "red flag" in her mind and caused

her to question whether the Grames offer was legitimate). She knew nothing about the Investor

---

[29]Clearly, Fabbro wanted out from under the delinquent mortgages, but she also expected
Heywood to act in good faith and do his best to obtain the most advantageous bargain possible under the
circumstances.

[30]An agent cannot, without violating his general duty of good faith, act for persons having
interests adverse to those of his employer, unless he acts with the consent of his employer after full
disclosure. See RESTATEMENT (THIRD) OF AGENCY § 8.06 (2006).

Group's efforts to sell the Property to the Chubaks during the time that legal and equitable title was

in her name and during which her listing agreement with RE/MAX and Heywood was still open

and existing.  She knew only that she listed the Property with RE/MAX and Heywood on March 1,

2006 and that Heywood procured what appeared to be a legitimate offer equal to amounts

negotiated with her lenders.

Fabbro also knew nothing about the Investor Group's intent to use the Grames REPC to

leverage the lenders into an agreement to release their liens on the assumption that there was not

enough value in the Property to pay them in full.  She knew nothing about the Investor Group's

need to use the Chubak money from the retail sale to fund their purchase from Fabbro.  Moreover,

many of the documents required to conduct a short sale were not put in place or executed by Fabbro

for over three months after she listed the Property with RE/MAX and Heywood.

Finally, when Heywood failed to advise Fabbro of the Chubak offer, he failed to advise her

of a material fact.  Fabbro thought her only option was selling the Property to Grames for $352,000,

which was false, but Heywood and Richmond induced her to move forward with the Grames offer

so that the Investor Group could close the sale with the Chubaks, pay off Fabbro's lenders, and

divide the remaining proceeds among themselves.

Had Fabbro been given the opportunity to sell the Property to the Chubaks, even with

Heywood's assistance, she most likely could have paid her lenders in full, avoided the necessity of

a short sale, and walked away from the Chubak closing with money to pay towards other debts.  It

is even feasible that Fabbro could have avoided bankruptcy and thereby prevented potential further

damage to her credit history and reputation.  Fabbro reasonably relied upon statements made to her

about the Grames REPC and the Grames Addendum and did so to her detriment or damage.

Appropriate short sales may have their place in today's economy, but the so-called short sale in this particular case did not work.[31]

The Defendants argue that without the Investor Group's involvement, but with a sale to the Chubaks, Fabbro would have had to pay her lenders the full amounts of their claims, plus a 6% real estate commission, unpaid utility bills and various closing costs. These amounts, according to the Defendants, would have equaled or exceeded the Chubak sale price. Thus, if Fabbro had been the seller in the retail sale, she would not have received any funds. This "no harm, no foul" argument is inaccurate and misses the point.

Had Fabbro been the seller in the Chubak sale, the following net proceeds would have been received:

| | |
|---|---|
| Gross sale price | $441,000 |
| Less carpet credit[32] | $1,000 |
| Less repair costs[33] | $1,000 |
| **NET PROCEEDS** | $439,000 |

Had Fabbro been the seller in the Chubak sale, the following amounts would most likely have been paid from the net proceeds:

| | |
|---|---|
| IndyMac Bank payoff through March 30, 2006 | $381,002.08 |

---

[31]The Court is not condemning short sales per se, but only how the transactions were conducted here.

[32]Relying on Mr. Chubak's testimony, the Trustee argues that the amount of the carpet credit paid to the Chubaks was only $200. However, the Court finds that the parties negotiated a $1,000 carpet credit as reflected on Addendum No. 3 to the Chubak Real Estate Purchase Contract.

[33]As previously stated, the Court finds that less than $1,000 was spent by the Investor Group to place the Property in the condition it was in when Fabbro vacated the house in early April. Nevertheless, for purposes of this calculation, the Court elects to use the full $1,000 amount.

16

| | |
|---|---|
| IndyMac Bank interest and late fees to closing[34] | $6,800.31 |
| Citimortgage payoff as of June 29, 2006 | $20,309.84 |
| Unpaid utilities/taxes | $1,791.16 |
| Title insurance | $2,159 |
| Real estate commissions[35] | $15,435 |
| Home warranty | $375 |
| Closing fees | $400 |
| **TOTAL SALE COSTS** | $428,272.39 |
| **FUNDS TO FABBRO** | $10,727.61 |

The Defendants argue that the Chubak sale could only have occurred after they had control of the Property and only with their expertise.  Had the Investor Group properly explained their short sale practices to Fabbro at the outset and paid off her underlying mortgages with their own money, the Court might agree.  However, this the Investor Group failed to do.

From the foregoing findings, the Court makes the following:

**III.    CONCLUSIONS OF LAW**

**A**.    **Common Law Fraud**

Property rights must be determined under state law.[36]  Accordingly, the rights and remedies asserted by the Plaintiff and the Defendants under this cause of action, as well as those asserted in

---

[34]This dollar amount reflects 89 days of interest paid to IndyMac Bank at $71.91 per day and late fees paid at $66.72 per day for 6 days.

[35]This dollar amount reflects the $13,230 commission paid to the Chubaks' real estate agent (3% of the sales price) and the $2,205 commission actually paid to Heywood, which Heywood testified was all that he was expecting.

[36]Butner v. U.S., 440 U.S. 48 (1979).

17

the causes of action for fraudulent transfer under § 548, state law fraudulent transfer, negligence,

civil conspiracy, breach of contract and entitlement to punitive damages must be decided pursuant

to state law.

Under Utah law, a party attempting to establish fraud must prove by clear and convincing

evidence each of the following elements:

> the making of a false representation concerning a presently existing material fact which the
> representor either knew to be false or made recklessly without sufficient knowledge, or the
> omission of a material fact when there is a duty to disclose, for the purpose of inducing
> action on the part of the other party, with actual, justifiable reliance resulting in damage to
> that party. [37]

A person cannot be liable for fraud unless he made the false representations himself,

authorized someone to make them for him, or participated in the misrepresentations in some way,

such as through a conspiracy.[38]

**1.     False Representation or Omission as to Material Fact[39]**

Heywood and Richmond made numerous representations to Fabbro of existing material

facts which they knew to be false.  Among other things, they represented to Fabbro that Grames

was the sole offeror in the picture on May 18, 2006 and that the sale of the Property to Grames, in

fact, closed on June 28, 2006.  Moreover, they failed to disclose to Fabbro that they were members

---

[37]Taylor v. Gasor, Inc., 607 P.2d 293, 294 (Utah 1980).  See also Franco v. Church of Jesus
Christ of Latter Day Saints, 21 P.3d 198, 207-208 (Utah 2001).

[38]Israel Pagan Estate v. Cannon, 746 P.2d 785, 792 (Utah Ct. App. 1987).

[39]Information is considered material to the transaction if it might reasonably affect the principal's
decision.  See RESTATEMENT (SECOND) OF TORTS § 538(2)(a) (1977) which provides: "The matter is
material if a reasonable [person] would attach importance to its existence or nonexistence in determining
his choice of action in the transaction in question."

of the Investor Group and that they had a pecuniary interest in the Investor Group's activities.[40]

They also failed to disclose the Investor Group's efforts to sell the Property to the Chubaks during

the time that legal and equitable title was in Fabbro's name.  Fabbro thought her only option was

selling the Property to Grames for $352,000, which was false, but Heywood and Richmond induced

her to move forward with the Grames offer so that the Investor Group could close the sale with the

Chubaks, pay off Fabbro's lenders, and divide the remaining proceeds among themselves.

## 2.    Justifiable Reliance

Justifiable reliance is a subjective standard.  "Justification is a matter of the qualities and

characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of

the application of a community standard of conduct to all cases."[41]  In this case, Fabbro justifiably

relied on Heywood and Richmond's representations and ultimately signed documents presented to

her by Richmond which led her to convey the Property to the Trust on June 12, 2006 and to assign

her 100% beneficial interest in the Trust to RHB on June 28, 2006.  Neither Heywood nor

Richmond gave Fabbro any reason to suspect that they were not acting in her best interest nor any

reason to believe that she could not rely on their representations.  Accordingly, the Court

determines that Fabbro justifiably relied upon Heywood's and Richmond's representations and did

---

[40]"One of the fundamental tenets of the Anglo-American law of fraud is that fraud may be
committed by the suppression of the truth . . . as well as the suggestion of falsehood."  First Security Bank
of Utah v. Banberry Dev. Corp., 786 P.2d 1326, 1328 (Utah 1990) (citing Elder v. Clawson, 384 P.2d
802, 804-05 (Utah 1963)).  "[W]hether a duty to speak exists is determinable by reference to all the
circumstances of the case. . . ."  Id.  In this matter, Heywood, as Fabbro's real estate agent, clearly had a
duty to disclose.  Moreover, the Court finds and concludes that Richmond had a duty to disclose
particularly in light of his relationship with Heywood, his regular and almost exclusive contact with
Fabbro on behalf of the Investor Group, Fabbro's apparent confidence and trust in his knowledge and
integrity, his constant reassurance to Fabbro that pursuing a short sale was her best course of action, and
his clear knowledge that Grames (his spouse) had no independent ability to buy the Property or finance its
acquisition.

[41]Field v. Mans, 516 U.S. 59, 71 (1995).

so to her detriment or damage.

3.      **Damage**

The final element of fraud is that the plaintiff sustain damages.[42]  Pursuant to

§ 549(1) of the Restatement (Second) of Torts:  "The recipient of a fraudulent misrepresentation is

entitled to recover as damages . . . the pecuniary loss to him of which the misrepresentation is a

legal cause, including . . . the difference between the value of what he has received in the

transaction and its purchase price or other value given for it."[43]  Using the calculations set forth

above, Fabbro's damages in the present case were at least $10,727.61.

Accordingly, the Court concludes that there is clear and convincing evidence that Heywood

and Richmond should be jointly and severally liable to Fabbro in the amount of $10,727.61.  The

Trustee stands in the shoes of Fabbro and is entitled to that judgment.  The Court further finds that

Heywood and Richmond's conduct was intentionally fraudulent or manifested a knowing and

reckless indifference toward and disregard of Fabbro's rights.  With respect to each of the

remaining Defendants, this cause of action should be dismissed.

B.      **Fraudulent Transfer, 11 U.S.C. § 548(a)(1)(B)**

In order to prevail on his § 548 claim, the Trustee has the burden of establishing by a

preponderance of the evidence the transfer of:

> an interest of the debtor in property . . . within 2 years before the date of the filing of the
> petition, if the debtor voluntarily or involuntarily –
>
>> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or
>> obligation; and

---

[42]Taylor, 607 P.2d at 294.

[43]RESTATEMENT (SECOND) OF TORTS § 549(1)(a) (1977).

20

(ii) (I) was insolvent on the date that such transfer was made . . . or became
insolvent as a result of such transfer or obligation.

On June 28, 2006, when Fabbro assigned her 100% beneficial interest in the Trust to RHB,

the value of her interest was at least $10,727.61.  The transfer occurred within two years prior to the

filing of the petition.  RHB did not give any value in exchange for the transfer.  And Fabbro was

insolvent on the date of the transfer or became insolvent as a result of the transfer.  Accordingly, the

Trustee may avoid the transfer pursuant to § 548(a)(1)(B).

In addition, pursuant to §§ 550(a) and 550(b), the Trustee can recover the value of the

transfer from not only the initial transferee, RHB, but also from the following immediate or mediate

transferees:  Richmond, Heywood, Ayres Law Firm, William F. Nelson, Brenda Nelson, Chris

Patterson, and Inferno.  The value of the transfer here was the net value of Fabbro's beneficial

interest, or $10,727.61.  Accordingly, judgment should be entered against each of these Defendants,

jointly and severally, for that amount.  With respect to each of the remaining Defendants, this cause

of action should be dismissed.

**C.      Utah Uniform Fraudulent Transfer Act**

Fabbro's transfer of the Property to the Defendants, including the transfer of her 100%

beneficial interest in the Trust on June 28, 2006, may also be avoidable by the Trustee under Utah

Code Ann. § 25-6-6.

Utah Code Ann. § 25-6-6 provides in relevant part:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose
claim arose before the transfer was made or the obligation was incurred if:

(a) the debtor made the transfer or incurred the obligation without receiving a
reasonably equivalent value in exchange for the transfer or obligation; and

(b) the debtor was insolvent at the time or became insolvent as a result of the transfer

or obligation.

On June 28, 2006, when Fabbro assigned her 100% beneficial interest in the Trust to RHB, the value of her interest was at least $10,727.61. RHB did not give any value in exchange for the transfer. Moreover, Fabbro was insolvent on the date of the transfer or became insolvent as a result of the transfer.[44] However, for the Utah Uniform Fraudulent Transfer Act ("the UFTA") to apply, the statute requires a "creditor-debtor" relationship.

The UFTA broadly defines the word "creditor" to mean a person who has a claim.[45] A "person" means an individual, partnership, limited liability company, corporation, association, organization, government or governmental subdivision or agency, business trust, estate, trust, or any other legal or commercial entity.[46] A "claim" is also broadly defined under the UFTA as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[47] Because the UFTA is remedial in nature, the Utah Supreme Court has held that the statute should be liberally construed.[48]

The Defendants argue that the Trustee is barred from recovering under the UFTA because he is not a creditor who has a claim. They argue further that the Trustee filed late proofs of claim on

---

[44] Under the UFTA, "[t]he level of insolvency necessary to meet the statute [sic] requirement is not insolvency in the bankruptcy sense but merely a showing that the party's assets are not sufficient to meet liabilities as they become due." Meyer v. General Am. Corp., 569 P.2d 1094, 1096 (Utah 1977).

[45] Utah Code Ann. § 25-6-2(4).

[46] Utah Code Ann. § 25-6-2(9).

[47] Utah Code Ann. § 25-6-2(3).

[48] National Loan Investors, L.P. v. Givens, 952 P.2d 1067, 1069 (Utah 1998). See also Tolle v. Fenley, 132 P.3d 63 (Utah Ct. App. 2006).

behalf of IndyMac Bank and Citimortgage and may not fall within the ambit of those authorized to

file late claims.  Notwithstanding the Defendants' arguments, and based on the broad definitions of

"creditor," "person," and "claim" under the UFTA and the direction from the Utah Supreme Court to

construe the statute liberally, the Court concludes that the Trustee's claims for and on behalf of

IndyMac Bank and Citimortgage qualify him as a creditor with a claim under this statute.  The

proofs of claim filed by the Trustee are, at a minimum, disputed and may ultimately be allowable as

well.  Accordingly, the Court concludes that the Trustee has met the test of showing a creditor-

debtor relationship in this matter and has established each element of the fraudulent transfer by a

preponderance of the evidence.  As a result, he can recover the value of the transfer from RHB.[49]

       As with the cause of action under § 548, the value of the transfer was the net value of

Fabbro's beneficial interest, or $10,727.61.  Judgment should be entered against RHB for that

amount.  With respect to each of the remaining Defendants, this cause of action should be dismissed.

**D.     Negligence**

       To establish a claim of negligence under Utah law, a plaintiff must prove by a preponderance

of the evidence each of the following elements: (1) that the defendant owed the plaintiff a duty; (2)

that the defendant breached that duty; (3) that the breach of duty was the proximate cause of the

plaintiff's injury; and (4) that the plaintiff in fact suffered injuries or damages.[50]

       When a real estate agent is engaged to represent the interests of the seller in a real estate

transaction, the agent has a duty to exercise fidelity and good faith in all matters within the scope

---

       [49]Utah Code Ann. § 25-6-8(1)(a) provides in relevant part:  "In an action for relief against a
transfer or obligation under this chapter, a creditor . . . may obtain . . . avoidance of the transfer or
obligation to the extent necessary to satisfy the creditor's claim."

       [50]Webb v. University of Utah, 125 P.3d 906, 909 (Utah 2005).

of his employment.  The agent must always make full, fair, and prompt disclosure of all facts

within his knowledge which may affect the principal's rights and interests or influence the

principal's decision making with respect to the property at issue.[51]

Under the plain language of the listing agreement executed by Fabbro on March 1, 2006,

Heywood and RE/MAX owed Fabbro certain duties,[52] including duties of loyalty, full disclosure,

and reasonable care.  Additionally, Heywood owed Fabbro duties of loyalty, obedience, full

disclosure, confidentiality, reasonable care and diligence pursuant to Utah Administrative Code

Rule 162-6.[53]

The Court concludes that there was sufficient evidence showing that Heywood and

RE/MAX breached their duties to Fabbro by, among other things, failing to present all offers on the

Property when the Property was not under contract or in the Trust.[54]  The Court also finds that

---

[51]The Court finds the following articulation of this principle helpful:  "[T]here flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's right and interest or influence his actions."  Holst v. Fireside Realty, Inc., 948 P.2d 858, 862-63 (Wash. App. 1997).

[52]RE/MAX's liability arises not only under the doctrine of respondeat superior, but also from its principal-agent relationship with Fabbro.  As the listing broker, RE/MAX became Fabbro's agent with respect to the sale of the Property.  Heywood's status in the relationship between RE/MAX and Fabbro was that of a subagent and his tortious conduct is imputable to RE/MAX in its dual fiduciary capacity as Heywood's principal and Fabbro's agent.  See Phillips v. JCM Development Corp., 666 P.2d 876, 881 (Utah 1983).

[53]Utah Administrative Code Rule 162-6 governs licensee conduct for realtors licensed in the State of Utah.

[54]The Defendants assert that the Plaintiff must provide expert standard of care testimony to prove duty and breach of duty against each of the professionals in this case.  With respect to Heywood and

Richmond, who had a special relationship with Fabbro,[55] breached his duties to her by, among other things, representing that Grames was the sole offeror in the picture on May 18, 2006 and by failing to disclose that he was a member of the Investor Group and that he had a pecuniary interest in the Investor Group's activities. These breaches of duty were the proximate cause of Fabbro's damages in the amount of $10,727.61 and Richmond, Heywood, and RE/MAX should be jointly and severally liable to Fabbro, and hence to the Trustee, in that amount.[56] In addition, the Trustee for and on behalf of Fabbro is entitled to recover from Heywood the commission he received in the amount of $2,205. With respect to each of the remaining Defendants, this cause of action should be dismissed.

**E.    Civil Conspiracy**

In cases where the seller's real estate agent has acted in concert with one or more parties to conceal from the seller material facts about the sale of the property, the seller may assert a claim of conspiracy as a basis for relief. To prove a civil conspiracy under Utah law, a plaintiff must present clear and convincing evidence of each of the following elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of

---

RE/MAX, the Court disagrees. The Court acknowledges that expert testimony is often necessary in a professional negligence case to establish the standard of care for the industry. One exception to this rule, however, involves instances of negligence that are a matter of common knowledge comprehensible to laymen. See Schreiter v. Wasatch Manor, Inc., 871 P.2d 570, 574 (Utah Ct. App. 1994), quoting Nixdorf v. Hicken, 612 P.2d 348, 352 (Utah 1980) ("Where the propriety of the defendant's action 'is within the common knowledge and experience of the layman . . . the guidance provided by expert testimony is unnecessary.'"). With respect to Heywood and RE/MAX, specialized knowledge is not necessary to establish that Fabbro's realtor owed her certain duties, including duties of loyalty, full disclosure, and reasonable care, and that Heywood breached those duties by, among other things, failing to present all offers on the Property.

[55]See supra note 40.

[56]See supra note 52.

action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.[57]

In this case, the record clearly indicates that Heywood, Richmond, and the other members of

the Investor Group worked together to obtain the Property from Fabbro at the lowest possible price

and to flip it[58] as quickly as possible in order to make a profit.  As set forth above, the Investor

Group did this without full, fair, and prompt disclosure of material information, including a proper

explanation to Fabbro of the Investor Group's short sale practices and during the time that legal and

equitable title was in her name.  Moreover, Heywood and Richmond defrauded Fabbro and

breached their duties to her by, among other things, failing to present all offers on the Property

when it was not under contract or in the Trust.  Notwithstanding, the Court concludes that there has

been an insufficient showing to support a conclusion under the clear and convincing evidence

standard that the Defendants acted together, or had a meeting of minds, in a conspiracy to defraud

Fabbro.  Accordingly, this cause of action should be dismissed.

## F.      Breach of Contract

A contract existed between Fabbro and Heywood, as evidenced by the listing agreement

executed on March 1, 2006.  Heywood breached the contract by, among other things, failing to

present all offers on the Property to Fabbro when the Property was not under contract or in the

Trust.  Paragraph 7 of the listing agreement states, however:

> The parties agree that any dispute, arising prior to or after a closing, related to this Listing
> Agreement shall first be submitted to mediation through a mediation provider mutually agreed
> upon by the Seller and the Company.  If the parties cannot agree upon a mediation provider, the
> dispute shall be submitted to the American Arbitration Association. Each party agrees to bear
> its own costs of mediation.  If mediation fails, the other remedies available under this Listing

---

[57]Pagan, 746 P.2d at 790.  As the Pagan Court noted:  "Evidence is insufficient if it discloses acts
just as consistent with a lawful purpose as with an unlawful one."  Id. at 793.

[58]A commonly used term denoting the practice of buying low and selling high.

Agreement shall apply.

Mediation was not attempted in this case, and the Court concludes that failure to comply

with this prerequisite bars the Trustee from recovery under this cause of action, including an award

of attorney's fees pursuant to paragraph 8 of the listing agreement.[59]

**G**.    **Punitive Damages**

Punitive damages in Utah are governed by § 78B-8-201 of the Utah Code.  Section 78B-8-

201(1)(a) states:

> Except as otherwise provided by statute, punitive damages may be awarded only if compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

Section 78B-8-201(2) adds:

> Evidence of a party's wealth or financial condition shall be admissible only after a finding of liability for punitive damages has been made.

Based upon the findings of liability set forth above, the Court finds that punitive damages

may be awarded against Heywood and Richmond.  However, there has been insufficient evidence

produced to this point as to the appropriate amount of any such damages or the Defendants' ability

---

[59]The Plaintiff's failure to comply with paragraph 7 of the listing agreement might have been a basis for the Defendants to argue that the Plaintiff was precluded from pursuing any cause of action against Heywood and/or RE/MAX in this litigation.  However, the Defendants argued at trial that paragraph 7 defeated the Trustee's breach of contract cause of action only.  Further, the mediation clause was not asserted by the Defendants as an affirmative defense or raised as a legal issue in the Final Pretrial Order.  Moreover, the other causes of action alleged by the Plaintiff are either statutory in nature or are claimed torts which have a separate basis for their existence other than the listing agreement. Accordingly, the Court concludes that Heywood and RE/MAX have either waived the mediation requirement with respect to the Plaintiff's other causes of action or that such causes of action are not otherwise precluded.

to pay.  Accordingly, pursuant to Fed. R. Civ. P. 42(b),[60] the Court exercises its discretion and elects to allow the Plaintiff to present evidence on these issues only at a continued hearing on the trial.[61]  The Plaintiff is allowed 30 days from the date of these Findings and Conclusions to request a hearing on punitive damages and to file any additional briefing on this cause of action only.  Failure to timely request and set the hearing shall be a bar to any award of punitive damages.  The Defendants may file a response to the Plaintiff's submissions within 20 days after the Plaintiff's brief is filed.  A hearing may be set for any time following the time allowed for the Defendants' response.

This ruling is specifically intended to be interlocutory and no judgment will be entered at this time.  Final judgment will be entered following the above-described process and possible hearing on punitive damages.

---

[60]Fed. R. Civ. P. 42(b) provides in relevant part as follows: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue. . . ."

[61]Of course, "the measure of punishment [must be] both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408, 425 (2003).

28

**SERVICE LIST**

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.


Jeremy C. Sink
McKay, Burton & Thurman
170 South Main Street, Suite 800
Salt Lake City, UT 84101-1656


Blake D. Miller
Miller Guymon, P.C.
165 South Regent Street
Salt Lake City, UT 84111-1903


William F. Nelson
Brenda Nelson
1010 Arthur Circle
Rush Valley, UT 84069